William MULLIN, Plaintiff, Appellant,

v.

RAYTHEON COMPANY,
Defendant, Appellee.

No. 98–1656.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1998.

Decided Jan. 13, 1999.

J. Allen Holland, with whom John R. Cavanaugh and Lynch, Brewer, Hoffman & Sands, LLP were on brief, for appellant.

James F. Kavanaugh, Jr., with whom Deborah W. Kirchwey and Conn, Kavanaugh, Rosenthal, Peisch & Ford, L.L.P. were on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

SELYA, Circuit Judge.

Plaintiff-appellant William Mullin sued his employer, defendant-appellee Raytheon Company, contending that his demotion (and a concomitant reduction in remuneration) constituted age discrimination in contravention of both the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and the Massachusetts Anti–Discrimination Act, Mass. Gen. Laws ch. 151B, § 4(1B), (Chapter 151B). The district court granted Raytheon's motion for summary judgment on all counts. *See Mullin v. Raytheon Co.*, 2 F.Supp.2d 165 (D.Mass.1998). Mullin's appeal raises, *inter alia*, a question of first impression in this circuit as to the viability of "disparate impact" claims in age discrimination cases. We conclude that such claims are not cognizable under either federal or state law.

## I. BACKGROUND

Consistent with the summary judgment standard, we recount the material facts in the manner most congenial to the appellant's *theory of the case, accepting his (properly documented) version of genuinely disputed facts and drawing all reasonable inferences in his favor. See Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990).

Raytheon assigns salaried employees a labor grade on a numeric scale that ranges from 4 to 18. Each grade corresponds to a different (successively higher) earnings bracket. Prior to filing this action, the appellant worked for Raytheon for some twenty-nine years. He steadily climbed the corporate lattice. In 1979, he achieved a grade of 15 and became manager of manufacturing operations for Raytheon's Andover (Massachusetts) plant—a position in which he supervised more than 2,000 employees. At that

point, his upward progression ceased. Although he retained a grade 15 classification until 1995, his duties changed and his authority gradually contracted. In 1984, Raytheon transferred Mullin to its Lowell (Massachusetts) plant, where he became a second-shift manager, supervising some 400 employees. Beginning in 1989, the company informally assigned him to the role of trouble-shooter and transferred him from area to area, according to need. In 1994, Raytheon designated him as the manager of the Gyro and Motorwind Work Centers at the Lowell plant—a position in which he oversaw fewer than 100 subordinates.

Over the years, Raytheon's principal business has been the manufacture of military ordnance. When the Cold War ended and Congress slashed the Defense Department's procurement budget, the volume of work potentially available to Raytheon decreased proportionately. In an effort to adjust to these economic realities, Raytheon inaugurated major structural changes. Among other steps, it closed the Lowell plant and one in Manchester, New Hampshire, and folded the operations previously performed at those locations into its Andover plant. In the process, Raytheon relocated the appellant and his department to Andover.

In addition to plant closings and consolidations, the retrenchment produced a significant number of layoffs and reassignments. It also included a wage freeze, during which Raytheon assayed the commensurability of upper-level salaried employees' assigned labor grades and actual responsibilities. The company evaluated each position in light of criteria such as the complexity of the work undertaken, the number of employees supervised, and the financial responsibility inherent in the job. In the appellant's case, it deemed his grade (15) inconsistent with his duties and downgraded him to level 12—an action that, under established corporate policy, required a downward compensation adjustment to bring him within the salary range that corresponded to his new classification.[1]

Claiming that age discrimination prompted this demotion, the appellant sued. His complaint, grounded in both federal question jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction, 28 U.S.C. § 1332—Mullin is a citizen of New Hampshire and Raytheon is a Delaware corporation with its principal place of business in Massachusetts—set out four statements of claim: two for disparate treatment (one under the ADEA and one under Chapter 151B) and two for disparate impact (one under the ADEA and one under Chapter 151B). After a period of discovery, Raytheon moved for *brevis* disposition and the district court obliged. *See Mullin,* 2 F.Supp.2d at 175. This appeal ensued.

## II. ANALYSIS

Summary judgment is a device that "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). Its essential role is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992). The mechanics of the device are familiar, *see, e.g., Garside,* 895 F.2d at 48, and do not warrant exegetic description here. For present purposes, it suffices to note that summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether these criteria have been satisfied, we, like the trial court, "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990).

With this brief preface, we turn to the appellant's asseverational array. In the process, we review the lower court's decision de novo. *See Garside,* 895 F.2d at 48.

---

1. Raytheon phased in the pay cut, reducing the appellant's salary by 10% in October 1995, and scheduling another 10% reduction to take place six months thereafter. The second cut never materialized because Mullin took a medical leave.

**A. Disparate Treatment—ADEA and Chapter 151B Claims.**

■ The tripartite burden-shifting regime conceived by the Supreme Court for use in Title VII cases, *see St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to disparate treatment claims under the ADEA and Chapter 151B. *See, e.g., Mesnick,* 950 F.2d at 823 (ADEA); *Whalen v. Nynex Info. Resources Co.,* 419 Mass. 792, 795, 647 N.E.2d 716, 718 (1995) (Chapter 151B). The parties concede that the appellant proffered a prima facie case and that Raytheon, by citing the cuts in defense spending, the attendant need to downsize, and the outcome of the personnel reevaluation, articulated a legitimate, non-discriminatory explanation both for restructuring and for demoting the appellant. Thus, the contest here revolves around the third step of the *McDonnell Douglas* pavane.

■ For purposes of Mullin's ADEA-based disparate treatment claim, we must therefore concentrate on whether he adduced enough evidence to create a trialworthy question both as to the employer's alleged motivation (animus based on age) and as to the pretextuality of its explanation for the adverse employment action. *See Mesnick,* 950 F.2d at 823; *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8–9 (1st Cir.1990).

■ The appellant's burden under Chapter 151B is somewhat less onerous. While federal law requires a showing of pretext plus age animus, the Massachusetts courts appear, at the third step of the pavane, to require a claimant to show only pretext. *See Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 444–46, 646 N.E.2d 111, 116–17 (1995).[2] The difference between the federal "pretext-plus" standard and the Massachusetts "pretext-only" standard,

though sometimes significant, is irrelevant in this case. The district court determined that the appellant failed to raise a genuine issue as to either pretext or age animus, *see Mullin,* 2 F.Supp.2d at 172, and, since we agree with the former determination, the appellant's disparate treatment claims fail under either standard.

■ We need not tarry. Raytheon advanced a strong, objectively verifiable set of reasons for consolidating operations, restructuring its work force, and downgrading Mullin: significant revenue loss stemming from massive Defense Department cutbacks, culminating in a reevaluation of all upper-echelon salaried employees. The appellant points to nothing that casts doubt upon the legitimacy of this reason, nor does he proffer any substantial evidence that would permit a rational jury to find that Raytheon rigged the restructuring in a fashion designed to ensure that the appellant's labor grade and/or compensation level would be reduced unfairly. The district court painstakingly analyzed all the appellant's submissions in this regard, *see id.* at 169–71, and it would be pleonastic to rehearse that discussion here. We content ourselves with saying that, after having carefully sifted the record, we uphold the lower court's disposition of the disparate treatment claims for essentially the reasons elucidated in its rescript. *See Lawton v. State Mut. Life Assur. Co. of Am.,* 101 F.3d 218, 220 (1st Cir.1996) (counseling appellate courts not to wax longiloquent when a trial court has resolved a claim correctly and explained its rationale in a well-reasoned rescript); *In re San Juan Dupont Plaza Hotel Fire Litig.,* 989 F.2d 36, 38 (1st Cir.1993) (similar).

**B. Disparate Impact—ADEA.**

■ The linchpin of a disparate treatment claim is proof of the employer's discriminatory motive. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Not so a claim of disparate impact: that type of claim is predicated not on proof of inten-

---

**2.** This conclusion assumes, favorably to the appellant, that *Blare* remains good law. *But cf.*

*McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 312 (1st

tional discrimination, but, rather, on proof that the employer utilizes "employment practices that are facially neutral in their treatment of different groups but ... in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* Although the district court skirted the question whether a disparate impact cause of action lies under the ADEA, *see Mullin,* 2 F.Supp.2d at 174–75, we take a more direct route. *See Mesnick,* 950 F.2d at 822 ("An appellate panel is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground.").

■ We begin by focusing on the statutory language. *See Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). In pertinent part, the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A commonsense reading of this statement strongly suggests that the statute includes a requirement of intentional discrimination. *See Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1007 (10th Cir. 1996) ("It would be a stretch to read the phrase 'because of such individual's age' to prohibit incidental and unintentional discrimination that resulted because of employment decisions which were made for reasons *other than age.*") (emphasis in original). However, Title VII contains parallel language,[3] and the Supreme Court concluded almost three decades ago that such language encompassed a theory of liability based on disparate impact. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (holding that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in opera-

tion"). The question, then, is whether the ADEA, despite the apparent linguistic inhospitability, also should be read to encompass disparate impact claims.

Congress enacted the ADEA in 1967. Prior to 1993, several courts ruled that the ADEA permitted the maintenance of disparate impact claims. *See, e.g., Finnegan v. Trans World Airlines, Inc.,* 967 F.2d 1161, 1163 (7th Cir.1992); *Maresco v. Evans Chemetics,* 964 F.2d 106, 115 (2d Cir.1992); *EEOC v. Borden's, Inc.,* 724 F.2d 1390, 1394–95 (9th Cir.1984); *Leftwich v. Harris–Stowe State Coll.,* 702 F.2d 686, 690 (8th Cir.1983). All of these courts simply assumed that *Griggs* had settled the issue. The tectonic plates shifted when the Court decided an ADEA case, *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Although *Hazen Paper* involved disparate treatment rather than disparate impact, *see id.* at 610, 113 S.Ct. 1701, language in the majority and concurring opinions caused lower courts to rethink the viability of disparate impact doctrine in the ADEA context.

Writing for a unanimous Court in *Hazen Paper,* Justice O'Connor declared that "[d]isparate treatment ... captures the essence of what Congress sought to prohibit in the ADEA." *Id.* at 610, 113 S.Ct. 1701. Congress passed the ADEA due to "its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Id.* Consequently, the rationale that undergirds the statute is inapposite in instances where the employment decision is "wholly motivated by factors other than age, ... even if the motivating factor is correlated with age." *Id.* at 611, 113 S.Ct. 1701.

This analysis is telling. Since disparate impact claims encompass the precise scenario that Justice O'Connor describes—disparate impact assigns liability when employment

---

Cir.1998) (opinion on order denying rehearing en banc).

**3.** Title VII makes it unlawful for an employer:
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1)–(2).

practices are grounded in factors other than the statutorily protected characteristic (say, age), yet fall more harshly on individuals within the protected group (say, older persons)—the inescapable implication of her statements is that the imposition of disparate impact liability would not address the evils that Congress was attempting to purge when it enacted the ADEA. Equally as important, Justice O'Connor's exposition of the purposes underpinning the ADEA sets that statute apart from Title VII (and, thus, effectively distinguishes *Griggs* ). Congress enacted Title VII in an effort to equalize employment opportunities for individuals whose employment prospects had been dimmed by past discriminatory practices. *See Griggs,* 401 U.S. at 429–30, 91 S.Ct. 849. Neutral, nonessential employment policies that discriminatorily impact protected groups would, if transposed onto such an uneven baseline, exacerbate the preexisting imbalance and countervail the core purpose of Title VII. Hence, the Court had ample reason to construe the language of Title VII to bar such practices, when not justified by an actual business necessity. *See id.* at 431, 91 S.Ct. 849.

By contrast, age-based discrimination correlates with contemporaneous employment-related conditions, not past discriminatory practices. *See Hazen Paper,* 507 U.S. at 610–12, 113 S.Ct. 1701; *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). The aging process is inevitable, and Congress was not trying to dissolve those naturally occurring relationships through the medium of the ADEA, but, rather, aimed to protect older workers against the disparate treatment that resulted from stereotyping them as less productive and therefore less valuable members of the work force because of their advancing years. This divergence in purpose between Title VII and the ADEA counsels convincingly against mechanistic adherence to *Griggs* in the ADEA milieu.

The concurring opinion in *Hazen Paper* lends further support to this conclusion. In it, Justice Kennedy wrote for himself and two other Justices to underscore that "nothing in the Court's opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory of Title VII." *Hazen Paper,* 507 U.S. at 618, 113 S.Ct. 1701 (Kennedy, J. concurring). "[T]here are," he wrote, "substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." *Id.*

Other courts also find the arguments to which Justice Kennedy referred compelling. Since 1993, a majority of the courts of appeals that have addressed the question have held that the ADEA does not recognize causes of action premised on disparate impact. *See Ellis,* 73 F.3d at 1007; *Lyon v. Ohio Educ. Ass'n, Prof'l Staff Union,* 53 F.3d 135, 138–39 (6th Cir.1995); *EEOC v. Francis W. Parker Sch.,* 41 F.3d 1073, 1077 (7th Cir.1994). The two courts of appeals that have held to the contrary have done so in reliance on pre-*Hazen Paper* precedents and the law of the circuit doctrine. *See District Council 37 v. New York City Dep't of Parks & Recreation,* 113 F.3d 347, 351 (2d Cir.1997) (relying on *Maresco,* 964 F.2d 106); *Houghton v. SIPCO, Inc.,* 38 F.3d 953, 958–59 (8th Cir.1994) (assuming, without any discernible analysis or citation, the availability of disparate impact theory, presumably in light of *Leftwich,* 702 F.2d 686).[4]

Three additional considerations persuade us that the majority view is correct, that *Hazen Paper* foretells the future, that *Griggs* is inapposite in the ADEA context, and that proof of intentional discrimination is a prerequisite to liability under the ADEA. We touch briefly on each consideration.

**1.** *Text and Structure.* A critical asymmetry in the texts of the ADEA and Title VII counsels convincingly against recognizing a disparate impact cause of action under the former statute. The ADEA stipulates that "[i]t shall not be unlawful for an employer . . . to take any action otherwise prohibited . . . where the differentiation is based on

---

4. In *Mangold v. California Pub. Util. Comm'n,* 67 F.3d 1470, 1474 (9th Cir.1995) (dictum), the Ninth Circuit expressed doubts as to the continued vitality of its pre-*Hazen Paper* ADEA dispa-

rate impact jurisprudence, but implied that its earlier decision still may be the law of the circuit.

reasonable factors other than age." 29 U.S.C. § 623(f)(1). This proviso permits employers to utilize factors other than age as grounds for employment-related decisions that differentially impact members of the protected class (individuals between the ages of 40 and 69). When this exception is read with the ADEA's general prohibition against age-based discrimination, the resulting construction follows: it shall be unlawful to "discriminate against any individual ... because of such individual's age," except when "based on ... factors other than age." Thus, if the exception contained in section 623(f)(1) is not understood to preclude disparate impact liability, it becomes nothing more than a bromide to the effect that "only age discrimination is age discrimination." Such a circular construction would fly in the teeth of the well-settled canon that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir.1985).

The Supreme Court's treatment of similar language in the Equal Pay Act is instructive on this front. In *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Court addressed 42 U.S.C. § 2000e–2(h), a statute that exempts wage differentials between men and women "authorized by the provisions of section 206(d) of Title 29" from Title VII's general prohibition against gender-based discrimination. Section 206(d), in turn, covers four types of situations, one of which parallels the exemption found in ADEA § 623(f)(1). Distilled, this provision allows payment of differential wages to men and women "based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv).

For analytic purposes, the Court juxtaposed this limitation on Equal Pay Act liability with Title VII's broadly inclusive prohibition against gender-based discrimination and commented that the limiting language

worked to "confine the application of the Act to wage differentials attributable to sex discrimination." *Gunther,* 452 U.S. at 170, 101 S.Ct. 2242. For that reason, the Justices concluded that the Equal Pay Act "has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of 'other factors other than sex'." *Id.; see also City of Los Angeles v. Manhart,* 435 U.S. 702, 710 n. 20, 713 n. 24, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (reasoning that the Equal Pay Act's "other factors other than sex" exception precludes liability based on disparities caused by independent factors). This statement suggests quite forcefully that the exception eliminates disparate impact from the armamentarium of weapons available to plaintiffs under the Equal Pay Act and, correspondingly, confines the scope of liability to instances of intentional discrimination, that is, to instances of disparate treatment.

We believe that the exception found in ADEA § 623(f)(1) effects a similar limitation on the type of claims that are permitted under the ADEA, and that any alternative conclusion would be untenable. When the ADEA's general prohibition and the statutory exception are read in *pari materia,* as a unified whole, the prohibition forbids disparate treatment based on age and the exception authorizes disparate impact. Thus, Professor Laycock's commentary, made in the Equal Pay Act context, applies equally to the ADEA: "The prohibition and the exception appear identical. The sentence is incomprehensible unless the prohibition forbids disparate treatment and the exception authorizes disparate impact." Douglas Laycock, *Continuing Violations, Disparate Impact in Compensation, and Other Title VII Issues,* 49 L. & Contemp. Prob. 53, 55 (1986).[5]

**2. Legislative History.** The legislative history of the ADEA provides added support for interpreting it independent of Title VII in regard to disparate impact claims. When enacted, Title VII included a provision requiring the Secretary of Labor to conduct a

---

**5.** We hasten to add that, since Title VII contains no comparable exception, this difference in the statutory schemes further distinguishes *Griggs.*

detailed study on the causes and effects of age discrimination. *See* Pub.L. No. 88–352, § 715, 78 Stat. 265 (1964). The resulting report, entitled *The Older American Worker: Age Discrimination in Employment* (1965) ( the Report), served as a principal impetus for the ADEA. *See Ellis,* 73 F.3d at 1008. The Report remarked the need for legislation to combat stereotyping and to rectify the perception that older persons cannot do particular jobs. *See* Report at 6–11, 21–22. Conversely, it found "no evidence of prejudice based on dislike or intolerance of the older worker." *Id.* at 6. Inasmuch as disparate impact theory is designed to combat invidious prejudice that is entirely unrelated to an ability to perform the job, *see Griggs,* 401 U.S. at 429–32, 91 S.Ct. 849, the Report's findings suggest that the theory has no utility in age discrimination cases.

The Report also distinguished between "arbitrary discrimination" based on age (disparate treatment) and other institutional arrangements that have a disproportionate effect on older workers (disparate impact). Report at 21–25. It recommended that arbitrary discrimination be statutorily prohibited, but that systemic disadvantages incidentally afflicting older workers be addressed through educational programs and institutional restructuring. *See id.; see also Ellis,* 73 F.3d at 1008. The Report thus segregated the appropriate remedies for disparate treatment from those for disparate impact. A fair reading of the ADEA—the statute that followed hard on the heels of the Report—indicates that Congress gave effect to this dichotomy by proscribing only *intentional* discrimination in age cases (while requiring the Secretary to study and develop education and research programs to lessen the negative employment effects that attend the aging process). *See* 29 U.S.C. §§ 622–623; *see also Ellis,* 73 F.3d at 1008.

**3.** *The 1991 Amendments.* The third factor that persuades us not to emulate the *Griggs* approach to Title VII in the ADEA context concerns more recent legislative developments. In 1991, Congress amended Title VII to provide explicitly for causes of action based upon disparate impact. *See* Pub.L. No. 102–166, § 105, 105 Stat. 1071,

1074–75 (1991). It simultaneously amended the ADEA in myriad respects, *see, e.g., id.* at § 115, 105 Stat. at 1079, but it did not create a corresponding disparate impact cause of action.

We are mindful that courts ordinarily should tread slowly in premising statutory construction on the action (or inaction) of subsequent Congresses. *See Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). Still, what transpires in a later legislative session sometimes constitutes a useful source of guidance in statutory interpretation cases, *see, e.g., Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980); *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980); *United States v. O'Neil,* 11 F.3d 292, 300 (1st Cir.1993); *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 755 n. 7 (1st Cir.1992), and we think that the circumstances at hand invite the application of that doctrine. Congress' insertion of an express provision for a disparate impact cause of action in Title VII renders the absence of such a provision in the ADEA—which was undergoing revision at the same time by the same committees and in the same bill—highly significant. *See Richerson v. Jones,* 551 F.2d 918, 927–28 (3d Cir.1977); *cf. General Elec. Co. v. Southern Constr. Co.,* 383 F.2d 135, 138 n. 4 (5th Cir.1967).

In sum, we have largely analogous statutes that diverge structurally on a discrete but important point. Coupled with the other factors we have discussed, this divergence helps to persuade us that Congress never intended to make a disparate impact cause of action available under the ADEA. We fully agree with the Sixth Circuit's assessment: "The ADEA was not intended to protect older workers from the often harsh economic realities of common business decisions and the hardships associated with corporate reorganizations, downsizing, plant closings and relocations." *Allen v. Diebold, Inc.,* 33 F.3d 674, 677 (6th Cir.1994).

To say more on this point would be supererogatory. For the foregoing reasons, we join those courts of appeals which have held that

the ADEA does not impose liability under a theory of disparate impact. We therefore affirm the district court's entry of summary judgment for Raytheon on the appellant's federal disparate impact claim.

### C. *Disparate Impact—Chapter 151B.*

■ We are left with the appellant's state-law disparate impact claim. The able district judge noted that Massachusetts has yet to determine whether disparate impact is actionable in age discrimination cases, but disposed of the claim on another ground. *See Mullin*, 2 F.Supp.2d at 175. Consistent with our earlier approach, we address the threshold question.

The appellant disagrees that the viability of disparate impact theory in age discrimination cases remains unsettled under state law. He notes that Massachusetts outlaws many types of discrimination by means of a single, comprehensive statute (Chapter 151B) and that the Massachusetts Supreme Judicial Court (SJC) has recognized a disparate impact cause of action with respect to one group protected by that statute. *See Cox v. New Engl. Tel. & Tel. Co.*, 414 Mass. 375, 385, 607 N.E.2d 1035, 1041 (1993) (discussing handicap discrimination). Building on this foundation, the appellant reasons that Chapter 151B makes a disparate impact theory available to all groups who fall within its protective carapace.

Although this construct possesses a certain superficial appeal, it cannot withstand scrutiny. Chapter 151B is divided into several sections and subsections, and the structure of the statutory scheme itself suggests that separate provisions within Chapter 151B are to be interpreted independently. Age, for example, is treated separately within the Chapter 151B taxonomy. *See* Mass. Gen. Laws ch. 151B, § 4(1B).[6] This is especially signif-

icant because, when the legislature amended Chapter 151B in 1984, it moved age (which previously had been grouped alongside race, color, religion, national origin, sex and ancestry) from within the compass of section 4(1) and placed it in a separate, newly crafted statutory niche, section 4(1B).[7] *See* An Act Relative to the Dismissal of Certain Persons from Employment or the Refusal to Employ Such Persons Due to Age, 1984 Mass. Acts 631, 632–33. This structural redesign constitutes potent evidence that the legislature meant the two provisions to be distinct and interpreted independently of one another. Were this not so, there would have been no need to split section 4(1) in two.

The appellant's hypothesis that the Massachusetts courts have cleared disparate impact for use in all instances arising under Chapter 151B (including age discrimination) is flawed in another respect as well; it not only overlooks the structure of the statutory scheme, but also misreads the case law. As stated, the hypothesis rests upon three SJC decisions. One is *Cox*, to which we soon shall return. Neither of the other two is persuasive authority on the point.

*School Comm. of Braintree v. MCAD*, 377 Mass. 424, 386 N.E.2d 1251 (1979), was a disparate treatment case that involved gender discrimination. The SJC mentioned disparate treatment and disparate impact as available theories of liability. *See id.* at 429, 386 N.E.2d at 1254. There is no indication that the court intended this passing mention to encompass age discrimination. In point of fact, the court referred specifically to race, color, religion, sex, and national origin (all protected groups under section 4(1)), but never mentioned age. *See id.* at 428, 386 N.E.2d at 1254.

The appellant's next case, *Lynn Teachers Union v. MCAD*, 406 Mass. 515, 549 N.E.2d

---

6. So, too, is handicap discrimination. *See* Mass. Gen. Laws ch. 151B, § 4(16). This fact tends to limit the long reach that the appellant attaches to *Cox.*

7. In pertinent part, the amended version of section 4(1) prohibits discrimination by a private-sector employer "in compensation or in terms, conditions or privileges of employment" on account "of the race, color, religious creed, national origin, sex, sexual orientation, ... or ancestry

of any individual," subject, however, to an exception for actions "based upon a bona fide occupational qualification." In contrast, section 4(1B) prohibits such employers from discriminating "in compensation or in terms, conditions or privileges of employment," on account "of the age of any individual," unless the employer's action is "based upon a bona fide occupational qualification."

97 (1990), also concerned a disparate treatment sex discrimination claim. The SJC stated in dictum that "[a] prima facie case of employment discrimination can be based on a theory of disparate impact or disparate treatment." *Id.* at 526, 549 N.E.2d at 103. This dictum is unhelpful for present purposes. The court's focus was on the proper scope of section 4(17)(a), a provision of Chapter 151B that exempts "bona fide seniority systems" from the general proscription of Chapter 151B. Relying in part on the fact that section 4(17)(a) had been introduced into Chapter 151B by way of the 1984 amendments, *see* 1984 Mass. Acts 631–33, the court held that the legislature had not intended "to screen bona fide seniority systems from the scrutiny of all of the Commonwealth's antidiscrimination laws." *Lynn Teachers,* 406 Mass. at 525, 549 N.E.2d at 103. Rather, section 4(17)(a) was directed only to age discrimination claims. *See id.* Thus, *Lynn Teachers* contradicts Mullin's hypothesis in two critical aspects: it exemplifies that all forms of discrimination proscribed by Chapter 151B ought not to be lumped together for interpretive purposes; and it illustrates the special way in which the SJC approaches age discrimination.

Against this backdrop, we find the approach taken by the SJC in *Cox* to be instructive. *Cox* dealt with Chapter 151B in the context of a handicap discrimination claim. Like age discrimination, handicap discrimination is governed by a separate provision within Chapter 151B. *See supra* note 6. Recognizing that *Cox* presented a question of first impression, the SJC stated that it would look for guidance to the federal courts' treatment of handicap discrimination under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See Cox,* 414 Mass. at 382, 607 N.E.2d at 1039. Declaring that there was "no reason to construe the Commonwealth's law differently" than its federal counterpart, the SJC then followed federal precedents holding disparate impact actionable under section 504. *See id.* at 390, 607 N.E.2d at 1043–44; *see also Alexander v. Choate,* 469

U.S. 287, 297 n. 17, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (collecting federal cases).

*Cox* epitomizes the SJC's general approach in such matters, *see, e.g., White v. University of Mass. at Boston,* 410 Mass. 553, 557, 574 N.E.2d 356, 358 (1991) ("The analysis of a discrimination claim is essentially the same under the State and Federal statutes."), and thus offers a window on the SJC's handling of Chapter 151B. It confirms our intuition that the SJC will interpret separate provisions of the statute independently. Moreover, *Cox* also shows that, when confronted with employment discrimination claims of novel impression, the SJC tends to rely on federal court interpretations of analogous federal statutes. *Accord Vasys v. Metropolitan Dist. Comm'n,* 387 Mass. 51, 54, 438 N.E.2d 836, 839 (1982) ("When the Legislature, in enacting a statute, adopts the language of a Federal statute, we will ordinarily construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts."); *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 611, 405 N.E.2d 106, 108 (1980) (similar).

We rule, therefore, that *Cox,* fairly read, does not justify an inference that the SJC, by recognizing disparate impact claims in terms of handicap discrimination, intended to transplant the theory into the age discrimination milieu. It follows that the SJC has not yet staked out a position in regard to the viability of age discrimination claims grounded in disparate impact. Because state law is inscrutable in this regard,[8] "it becomes our duty to vaticinate how the state's highest tribunal would resolve matters." *Moores v. Greenberg,* 834 F.2d 1105, 1107 (1st Cir. 1987). In that process, "we may seek inspiration from ... analogous state court decisions." *Kathios v. General Motors Corp.,* 862 F.2d 944, 949 (1st Cir.1988).

Here, we adopt the *Cox* court's approach. The Massachusetts age discrimination prohibition and the federal age discrimination prohibition are substantially identical, *compare* Mass. Gen. Laws, ch. 151B, § 4(1B), *with* 29

---

**8.** We have researched the reported decisions of the Massachusetts Appeals Court and find them unhelpful on the question.

U.S.C. § 623(a)(1), and, as said, the public policy concerns implicated by age discrimination are distinct from the concerns created by other forms of discrimination. Under these circumstances, we conclude that, when faced with the question, the SJC likely will look to the federal courts' interpretation of the ADEA and hold that an age discrimination claim cannot be grounded solely on a theory of disparate impact. Accordingly, we sustain the district court's rejection of the appellant's remaining claim.[9]

## III. CONCLUSION

We need go no further. Concluding, as we do, that the lower court appropriately granted summary judgment in Raytheon's favor on all four of Mullin's statements of claim, we affirm the judgment below.

*Affirmed.*

---

**9.** We may, perhaps, be conservative in our interpretation of state law, but the plaintiff, who chose to prosecute a state-law cause of action in a federal forum, had no right to anticipate that we would be more adventurous. *See, e.g., Porter v. Nutter*, 913 F.2d 37, 41 (1st Cir.1990); *Kassel v. Gannett Co.*, 875 F.2d 935, 950 (1st Cir.1989).