Scott v. UNH Coop. Ext.                    CV-03-027-M    02/09/04
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Mariatou (Diallo) Scott,
       Plaintiff

       v.                                    Civil No. 03-027-M
                                             Opinion No. 2004 DNH 030
University of New Hampshire
Cooperative Extension,
       Defendant


                          **O R D E R**


       Mariatou (Diallo) Scott, proceeding pro se, has sued the

University of New Hampshire Cooperative Extension ("UNH")

alleging violations of both Title VII, 42 U.S.C. § 2000e, and

New Hampshire's Law Against Discrimination, RSA 354-A.

Specifically, she claims that she was subjected to disparate

treatment, harassment, and retaliation based upon her race

and/or national origin.  Before the court is defendant's motion

for summary judgment.  Scott objects.  For the reasons given

below, defendant's motion for summary judgment is granted.



                    **Summary Judgment Standard**

       Summary judgment is appropriate when the record reveals "no

genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)). 2000)).

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for

2

trial." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Navarro, 261 F.3d at 94 (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

## Background

Outlined in brief, and viewed in the light most favorable to plaintiff, the non-moving party, the facts of this case are as follows. Mariatou (Diallo) Scott was hired by UNH in November 2000 to fill the position of Extension Educator, 4-H Youth Development, at the rank of Assistant Extension Educator. (Def.'s Mot. Summ. J., Exs. 5-6.) During the process that led to her hiring, Scott initially asked for a starting salary of $45,000 per year and the rank of Associate Extension Educator. (Baxter Aff. ¶ 7.) She ultimately accepted UNH's offer of employment as an Assistant Extension Educator at a salary of

$38,600. (Baxter Aff. ¶ 10; Exs. 5-6.) She began her employment, on a full-time basis, on January 2, 2001. As detailed in the letter offering Scott the position, her first twelve months of employment were to be "an initial . . . introductory period during which a determination is made about job performance and continued employment." (Def.'s Mot. Summ. J., Ex. 5.)

In May 2001, Roland ("Rollie") Barnaby, an Extension Educator and the County Office Administrator for Rockingham County, confronted Scott over her use of her assistant, Jean Hussey, for tasks outside the office. (Barnaby Aff. ¶¶ 13-15 see also Scott Dep. at 73-76.) According to Barnaby, Scott violated agency policy by using Hussey for inappropriate out-of-office tasks and by failing to notify him beforehand. (Barnaby Aff. ¶ 16.) In May and June, Scott and Barnaby discussed the use of assistants by extension educators between themselves at a full staff meeting. (Barnaby Aff. ¶¶ 20-30, 33-40.) During the course of those discussions, Scott told Barnaby that she would not follow the rules. (Barnaby Aff. ¶ 24.) She also claimed that she was being treated differently because of her race

and/or national origin, and that people had made racially discriminatory remarks to and/or about her.  (Barnaby Aff. ¶ 25; Scott Dep. at 74.)  However, she provided no specific examples. (Barnaby Aff. ¶ 25.)

On June 22, 2001, Scott wrote to John Pike, Dean and Director of the University of New Hampshire Cooperative Extension, to complain of racial discrimination.[1]  (Pike Aff. ¶ 19.)  In her letter, she stated her belief that she had been hired to fulfill the requirements of affirmative action and complained about being "ridicule[d], marginalized and discriminated against," and "looked upon as inferior, not human."  (Def.'s Mot. Summ. J., Ex. 9.)  She also attached a list of twenty-two "[t]hings I have heard and seen."[2]  (Def.'s

---

[1] Prior to receiving Scott's letter, in early May, Pike met with her and discussed, among other things, her concerns over workplace discrimination.  (Pike Aff. ¶ 6.)  Despite being asked to provide specifics, she declined to do so.  (Pike Aff. ¶¶ 6-7.)

[2] The items on the list are: (1) "We have a black lady downstairs for . . . .;" (2) "We are not ready for change;" (3) "She thinks she will bring change;" (4) "We do not want to change;" (5) "I do not want to see you where I go;" (6) "Why are you everywhere?;" (7) "Who is she to talk this way?;" (8) "She is lucky she is working with;" (9) "You are defaming UNHCE name;" (10) "What do you know about community development?;" (11) "What did you do, did you do it right?;" (12) "How did you teach, I hope you know how to do public speaking?;" (13) "You have to

5

Mot. Summ. J., Ex. 9.)  None of the items on the list were attributed by time, place, or speaker.[3]  Pike forwarded the letter to UNH's general counsel and to the UNH President's Special Assistant for Affirmative Action.  (Pike Aff. ¶ 19.)  In two subsequent meetings with Pike, Scott declined to provide any more specific information about the discriminatory acts she claimed to have suffered.  (Pike Aff. ¶¶ 23, 31.)  Even so, UNH's affirmative action office brought in an independent investigator to look into her complaints.  (Pike Aff. ¶ 33.)  After a four-month investigation, the investigator "concluded that there was no evidence of discrimination based on Ms. Scott's race and/or national origin."  (Pike Aff. ¶ 33.)

---

justify . . .;" (14) "You need to abide by the rule or you get fire[d];" (15) "What is she talking about?;" (16) "She wants to have mercy on her;" (17) "I have to prove myself to earn decent salary;" (18) "You cannot do in-service training because of barriers;" (19) "Cooperative Extension is not going to be a substance abuse institution;" (20) "I have to beg to be accepted;" (21) "You have to roll with the ball to get by;" (22) "Colleagues who avoided me totally."  (Def.'s Mot. Summ. J., Ex. 9.)

[3] Scott did, however, in her deposition, attribute most of the statements she appended to her letter to Pike.  When questioned regarding how those statements constituted evidence of discrimination based upon her race or national origin, she often stated that the statements themselves, without any additional facts, were evidence of discrimination.  (See, e.g., Scott Dep. at 110, 113, 115-16.)

At the end of July 2001, Charlene Baxter conducted Scott's six-month performance evaluation.[4] (Baxter Aff. ¶ 21.) Baxter's five-page follow-up letter, dated August 3, 2001, included, among other things, a list of eight tasks for Scott to accomplish, six of them in writing, by August 20. (Baxter Aff., Ex. A.) Throughout the fall of 2001, Scott failed to meet various deadlines for accomplishing those tasks. (Baxter Aff. ¶ 24-25.) On December 6, Scott informed Baxter that she would no longer attend staff meetings. (Baxter Aff. ¶ 30.)

In a letter dated December 20, near the end of Scott's one-year probationary period, Baxter told Scott that she (Baxter) could not recommend her for a permanent appointment. (Baxter Aff., Ex. B.) However, Baxter did offer to extend Scott's probationary period for another five months, to give her a chance to bring her performance up to an acceptable standard. (Baxter Aff. ¶ 33.) In the alternative, Scott was offered four months of transition assistance. (Baxter Aff. ¶ 35.) She

---

[4] In her deposition, Scott vigorously contested defendant's characterization of her late July meeting with Baxter as a "performance evaluation," but based upon the letter Baxter sent plaintiff afterward, no reasonable jury could conclude that the meeting was anything other than a performance evaluation.

declined both offers and, as a result, was terminated on January 11, 2002.  (Baxter Aff. ¶ 35.)

In this suit, Scott complains of disparate treatment, harassment (in the form of a hostile work environment), and retaliation, in violation of both Title VII and the New Hampshire Law Against Discrimination.  Specifically, Scott asserts that UNH subjected her to discriminatory disparate treatment by: (1) ranking her as an Assistant Extension Educator, rather than an Associate Extension Educator, upon her initial hiring; (2) insisting that she follow agency policy regarding the use of assistants; and (3) terminating her.  She also contends that she was subjected to a racially hostile work environment.[5]  Finally, she claims that Baxter's December 20 letter, and her termination, were acts of retaliation for her June 22 complaint of racial discrimination.  Based upon the

---

[5] Scott devotes considerable attention to Roland Barnaby's alleged statement that he would seek to have her fired if she did not follow "his" rules, presumably the rules pertaining to the use of assistants.  However, she does not indicate the legal theory under which that comment was wrongful, other than a vague assertion that Barnaby's attempt to impose the agency's rules upon her was an exercise of "white privilege."  Scott's invocation of "white privilege," without more, is insufficient to state a claim under Title VII.

8

foregoing, Scott seeks both money damages and injunctive relief in the form of an order requiring UNH to hire people of African descent in leadership positions in Cooperative Extension.

## Discussion

As a preliminary matter, it must be recognized that Scott's objection to summary judgment includes virtually no facts presented via affidavit or any other means contemplated by FED. R. CIV. P. 56(e). Thus, defendant's properly supported factual assertions are taken as unopposed, except to the extent they are legitimately called into question by Scott's deposition testimony, which is the only sworn evidence in this case supporting her claims.

I.  <u>Disparate Treatment</u>

A.  <u>Rank and Pay</u>

Scott claims that she was discriminated against when she was hired as an Assistant Extension Educator rather than as an Associate Extension Educator. However, she has neither produced nor alleged any facts demonstrating that she was paid less than other similarly situated employees. To the contrary, she

9

conceded in her deposition that she was "not aware of any other white people who had the same credentials as [she did] and who were in the same position [as she was] and who were treated any differently in terms of salary." (Scott Dep. at 123.)

Rather than identifying white employees with similar credentials who were paid more than she was, Scott rests her claim on an unsupported conclusory assertion that "UNH Cooperative Extension assumed that a person of African descent cannot and does not have the ability to perform at the level of an associate extension educator." (Pl.'s Obj. to Def.'s Mot. Summ. J. at 3.) Scott's belief, no matter how sincerely held, is insufficient to create a factual dispute that requires a trial.

Because Scott has made no showing that white employees with similar credentials were paid more than she, Scott has not made out a prima facie case of disparate treatment in rank and pay based upon race. See, e.g., Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 202 (1st Cir. 1987) (explaining that plaintiff in Title VII case "established a prima facie case by showing that

10

he received smaller raises than the white foremen received").
Without an allegation and, at this stage, evidence, that other
employees with similar experience, but of a different race, were
paid more than she, Scott is not entitled to go forward on a
Title VII disparate treatment claim based upon her rank and pay.

B.    Use of Assistants

Scott seems to suggest, although it is not entirely clear,
that she was discriminated against with respect to application
of rules governing the use of assistants outside the office.  In
her complaint, Scott states: "other educators utilized their
assistants at will and to their advantage."  (Compl. ¶ 4.2.)
However, she does not make specific, provable allegations that
specific other educators, not in a protected class, were allowed
to use their assistants in ways that she was not.[6]  Without such

_____

[6] In her deposition, Scott argued that Barnaby did not have
the authority to set office policy regarding use of assistants,
and she alleged that several extension educators were not
required to abide by the policy.  (Scott Dep. at 73, 75.)
However, even Scott's deposition testimony is too vague and
conclusory to create a genuine issue of fact:

          Q.  What information do you have that Mr. Barnaby
     did anything that was discriminatory in terms of the
     policy regarding the Educator Assistants?
          A.  Because Lynn – Lynn, Claudia, and what's the
     other person's name?  They don't have to – they do

11

allegations, Scott has not stated a Title VII disparate treatment claim based upon the use of assistants.  See Rowlett, 832 F.2d at 202.

She has failed, as well, to state a disparate impact claim. Disparate impact occurs when an "employer utilizes 'employment practices that are facially neutral in their treatment of

---

things as they want.  They don't ask permissions.
    Q.  But would you be privy to what every other Educator is doing in terms of asking for permission for their assistants?  Would you have knowledge of every single time they had asked about whether an assistant could work outside the office?
    A.  I don't have to have knowledge.
    Q.  I'm asking you.  Do you have specific knowledge about that?
    A.  I don't have specific knowledge.
    Q.  Okay.
    A.  But the way things are done, I'm not dumb or stupid.  You see how things are done in the office without having any specific knowledge of it.  And [sic] was always out with Lynn doing 4-H programming.  She got even paid for doing that.
    Q.  Do you have any specific knowledge of what permission she may have asked for that?
    A.  She doesn't.
    Q.  Do you have specific knowledge?
    A.  I don't have to have knowledge.  She does not ask.

(Scott Aff. at 75-76.)

different groups . . . [but] in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Mullin v. Raytheon Co., 164 F.3d 696, 700 (1st Cir. 1999) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335, n.15 (1977)). Here, Scott contended that her job was different from those of the other educators in ways that required her to use her assistant outside the office. (Barnaby Aff. ¶¶ 24, 36.) Thus, it could be argued that the facially neutral policy on the use of assistants perhaps had a greater impact on Scott than it had on other educators. However, that impact was not a function of her race or national origin but, rather, resulted from her own perception of how best to do her job. Thus, the policy was not one that fell more harshly on members of a protected class. For that reason, Scott has failed to state a Title VII disparate impact claim based upon the use of assistants.

C. Termination

In her complaint, Scott alleges that she "was terminated on account of [her] race and national origin." (Compl. ¶ 4.) Less than two pages later she states that "[b]ucking Rollie's

13

authority was the main reason why I was terminated."[7] (Compl. ¶ 4.2.) In Scott's view, her termination was discriminatory because it was accomplished by means of Barnaby's "power and white privilege." (Compl. ¶ 4.2.) But the mere fact that Barnaby is white does not make Scott's termination discriminatory, unless she was terminated because she is of African descent.

The problem with Scott's claim is that she has made no allegations, and offered no evidence on summary judgment, tending to show that her race or national origin played any role in the various employment actions she complains about. At the same time, defendant has produced admissible evidence, unopposed by Scott, demonstrating that she was terminated only after she refused to respond to UNH's offer to either extend her probationary period or grant her several months of transitional assistance. Moreover, defendant has also produced admissible evidence, again unopposed by Scott, demonstrating that the

_____

[7] She repeated that explanation in her deposition: "She [former colleague Mary Katsonis] knows the whole issue about me being fired because I told Rollie I would not go by his rules. And also I complain to John [Pike] about the derogatory remarks I got from my peers. Those two main reasons are the ones I was discharged." (Scott Dep. at 79.)

14

decision to extend her probationary period or terminate her was based upon a variety of legitimate non-discriminatory reasons, including several instances of outright insubordination,[8] at least one of which - her refusal to follow workplace rules - she admitted to in her deposition.  (Scott Dep. at 79.)

In terms of the legal framework for analyzing claims of employment discrimination, Scott has not made out a prima facie case of racial discrimination because she has not produced evidence that she "was performing [her] job at a level that rules out the possibility that [she] was fired for job performance." Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 15, 1st Cir. 1994); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  To the contrary, the undisputed evidence produced

---

[8] Those acts of insubordination include telling Barnaby that she would not follow policy on the use of assistants, telling Baxter that she would no longer attend staff meetings, and telling David Butler, UNH's Assistant Vice President of Human Relations, on January 3, 2002, that "she would not comply with her supervisor's expectations . . . would not engage in the level of teamwork and partnership required to complete her job successfully . . . [and] would not do any duties or fulfill any job expectations with which she did not agree."  (Butler Aff. ¶ 14.)

15

by defendant – which, if anything, is largely supported by Scott's own words – demonstrates that she repeatedly, and explicitly, refused to abide by the rules and expectations imposed by her employer. Based upon defendant's evidence of Scott's stated refusal to follow policies with which she disagreed, and her own statements to the same effect, no reasonable fact finder could conclude that Scott has ruled out the possibility that she was fired for her job performance.

However, even if Scott had established a prima facie case of racial discrimination, her claim cannot survive the third step of the McDonnell Douglas-Burdine-Hicks burden-shifting framework. At the third step, after "the employer proffers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason was a coverup for a discriminatory decision." Benoit, 331 F.3d at 174 (quoting Straughn v. Delta Air Lines, Inc., 250 F.f3d 23, 34 (1st Cir. 2001)). At this stage, plaintiff must "present[] sufficient evidence to show both that the employer's articulated reason for [the discharge was] a pretext and that the true reason [was] discriminatory." Straughn, 250 F.3d at 34 (citations omitted).

16

Scott has produced no evidence and no theory to support the conclusion that the decision to terminate her was pretextual; no reasonable factfinder could conclude that Scott was terminated for any reason other than unsatisfactory performance during a probationary period. Similarly, the record properly before the court – i.e., the factual assertions made in affidavits or other sworn statements – contains no support for the proposition that any of defendant's employees harbored discriminatory animus. There are no comments or actions by any UNH employee that indicate racial animus, and only a single comment, made by Barnaby prior to Scott's hiring, that even referred to her race.[9] The role that race and/or national origin played in defendant's dealings with Scott is perhaps best summed up in the following exchange from Scott's deposition:

> Q. And you also have a comment in that same paragraph [of the complaint], "A born African couldn't acquire the skills." And again, is that a conclusion that you reach, or does someone actually make that remark to you?

---

[9] According to Scott, before her first job interview, she was downstairs in the Rockingham County building and overheard Barnaby say "we have a black lady downstair[s]." (Scott Dep. at 46.) Given that Scott was offered a job at UNH, it is difficult to see how Barnaby's alleged comment, which happened to be true, either demonstrated or inspired racial animus.

17

        A.  A statement by Ed McAllister, but that he
    didn't know I have such skills when I met with him.
        Q.  But he didn't say a born African couldn't
    acquire the skills?
        A.  No.
        Q.  That's a conclusion you drew?
        A.  That's a conclusion I drew.


(Scott Dep. at 144.)  In sum, Scott has not "produce[d] evidence

that: (1) the employer's articulated reason for [terminating

her] is a pretext; and (2) the true reason is discriminatory

animus." Feliciano de la Cruz v. El Conquistador Resort, 218 F.

3d 1, 6 (1st Cir. 2000) (citing Thomas v. Eastman Kodak Co., 183

F.3d 38, 56 (1st Cir. 1999)).


II.  Harassment - Hostile Work Environment

    Scott states repeatedly in her complaint and in her

objection to defendant's motion for summary judgment that she

was subjected to "verbal abuse" and "derogatory remarks,

harassment, and intimidation."  Defendant argues that Scott has

failed to demonstrate that any of the allegedly discriminatory

comments she has identified were based, in any way, on her race

or national origin.


18

"An employee states a claim under Title VII if [she] alleges offensive, race-based conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive." Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 613 (1st Cir. 2000) (citing Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996)) (emphasis added).

Scott has identified only a single comment that made any reference to her race. Thus, she has alleged even less explicitly racial conduct than was alleged in Landrau-Romero, a case that barely withstood summary judgment. Id. at 614 (finding "the evidence in Landrau's affidavit and deposition" to be "close to the line"). The record in Landrau-Romero included "jokes and comments about [plaintiff's] race, including remarks about his 'kinky hair'" made by supervisors, id. at 609, and affidavits discussing long-standing unwritten rules barring blacks from management positions, id. at 610-11. By contrast, Scott has offered only a single innocuous race-related comment.

19

Moreover, Scott has offered no factual support from which a reasonable jury could conclude that this case involves circumstances in which "[a]lleged conduct that is not explicitly racial in nature may . . . be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim." Id. at 614 (citations omitted). Rather than producing evidence that white co-workers were treated better than she was, Scott asserts (and perhaps believes) that virtually anything she found objectionable in her workplace was tied to racial discrimination. Three examples from her deposition are illustrative:

> Q. What is discriminatory in your mind about saying why are you defaming UNH? Why do you think that's racial or national origin discrimination?
> A. It's racial because I am the only black there, and she doesn't go to other white people to say that. I never heard any other people where she said things like that to them.
> Q. Did she make any type of a comment that you were defaming them because you're black or because you're from Africa, or anything along those lines at all?
> A. If she's saying it she has a purpose and motive to say it.
> Q. I'm trying to understand why you think it would be racial discrimination or [national] origin discrimination for her to say why are you defaming UNH. I don't understand.
> A. Because I was the only black African. And she was just – I was the only target for her.

20

Q. And by "target," what did she do that made you conclude that you were a target?

A. Because I haven't seen her do anything to other white people.

Q. Doing what?

A. Saying to them that they're defaming the University name.

Q. Do you know if she said that to other white people?

A. If she did, I would have heard it because I talk to other people about it.

Q. Do you agree that she would have had conversations with people that you wouldn't be there at various times?

A. I cannot answer for that, but I know what she did to me. And I know it's discriminatory.

Q. Okay. Do you have any other facts to tell me of why you think that's discriminatory?

A. Because she said other things. You're lucky you are here working for UNH.

Q. And you think that –

A. Why am I doing this? I still don't know why she comes – she came to me asking me why am I doing this? What am I doing wrong? For her to come to me trying to make me look bad or target me because she doesn't like me, she doesn't want a black person.

Q. Did she say to you she didn't want a black person?

A. Why should she just come to me and –

Q. Can you answer my question? Did she ever say to you that she didn't want a black person?

A. She didn't say that. But her actions show that she doesn't like a black person.

Q. Did she tell anyone, to your knowledge, that she didn't want a black person to work at UNH?

A. I don't know. I don't know.

. . .

Q. Okay. So when you first interviewed with Larry Barker, he asked you whether you knew how to do public speaking?

21

A. Yes.

Q. Why is that a discriminatory comment?

A. He ask it differently without just telling me do you know how to do public speaking.

Q. What does that have to do with your race or national origin?

A. It does because he would not ask a white person that question because he's doubting me, who I am and what I can do. That's been the whole problem since I was hired.

Q. What information do you have that he wouldn't ask a white person that same question?

A. Because he wouldn't.

Q. What information do you have?

A. Because that question remained the same issue, the base of my being fired. Because they still didn't think that I can perform. They didn't know that I am a person, I have a brain.

Q. What information do you have that he wouldn't ask a white person whether that person could do public speaking.

A. Because he wouldn't. He wouldn't.

Q. Any specific information.

A. No.

. . .

Q. What about that comment [by Gail Kennedy, that she did not want to see Scott everywhere she goes] led you to conclude that there was any type of discrimination?

A. It's because I'm black. I'm black and I'm coming to her, she doesn't want black people around her.

Q. How do you know that?

A. Because she wouldn't say that to a white person.

Q. What specific facts do you have to support your conclusion that she made that comment to you because you're black or from Africa?

22

          A.  I don't have to have any specific [facts] to support that because her reaction to me as a human shows that she's purely discriminatory.
          Q.  Do you have any facts to support your conclusion?
          A.  I don't have to have facts.
          Q.  I'm asking do you have any?
          A.  The fact[] is what she says is the fact.
          Q.  That's the only thing you conclude that by?
          A.  Yes.

(Scott Dep. at 55-57, 60-61, 66-67.)  Scott's deposition testimony contains several more similar examples of facially race-neutral conduct that she asserts to be racially motivated, based upon nothing more than her otherwise unsupported (but apparently sincerely held) belief of discrimination.  That belief, absent some direct or circumstantial factual support, is simply not enough.  Even construed in the light most favorable to Scott, her claims do not amount to race-based conduct. Without sufficient race-based conduct, Scott has no Title VII harassment claim.

In addition, after careful review of the record, including Scott's deposition, the conclusion is inescapable that Scott has failed to describe a workplace that was objectively hostile or abusive.  Plainly, she had some upsetting perceptions of and

23

interactions with her co-workers, and she disagreed with some of the ways in which her employer chose to manage the Extension service. But in the Title VII context, Scott has described nothing more than ordinary (non-racial) workplace unpleasantness, of a sort that employees are routinely expected to endure. See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002) (quoting Suarez v. Pueblo, Int'l, Inc., 229 F.3d 49, 54, (1st Cir. 2000) ("[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins")).

Because Scott has identified only a single, largely innocuous reference to her race, and has not produced evidence of facts which, if proven, would allow a reasonable jury to conclude that she was subjected to an objectively hostile or abusive workplace, defendant is entitled to summary judgment on Scott's claim of race-based harassment.

III. Retaliation

Scott claims that Charlene Baxter's December 20, 2001, letter to her, and her discharge,[10] were acts of retaliation for her June 22, 2001, complaint to John Pike. Defendant argues that Scott has failed to establish a prima facie case of retaliation because, as a matter of law, there could be no causal connection between the June 22 letter of complaint and Scott's discharge, which occurred six months later. Defendant further argues that even if Scott had made out a prima facie case for retaliatory discharge, she has failed to bring forth evidence from which a reasonable jury could conclude that the reasons given for her discharge were pretextual.

"To establish a prima facie claim of retaliatory termination, [plaintiff] must demonstrate [her] engagement in statutorily protected activity, the fact of [her] dismissal, and a causal connection between the former and the latter. Kearney v. Town of Wareham, 316 F.3d 18, 23 (1st Cir. 2002) (citing

---

[10] Scott contends, in her objection to summary judgment, that the decision to terminate her was made on July 16, 2001, but because that fact is not something she would have direct knowledge of, and because she has offered no sworn testimony in support of that fact, her date of discharge, for purposes of defendant's motion for summary judgment, is January, 2002.

Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998); Blackie v. Maine, 75 F.3d 716, 722 (1st Cir. 1996); Hoeppner v. Crotched Mtn. Rehab. Ctr., Inc., 31 F.3d 9, 14 (1st Cir. 1994)).

Scott has not established a causal connection between her protected activity (the letter to Pike) and her termination. First, she was discharged more than six months after her protected conduct, and "the inference of a causal connection becomes tenuous with the passage of time." Rosenfeld v. Egy, 346 F.3d 11, 16 (1st Cir. 2003) (quoting Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir. 2003)). Second, during the six months between Scott's letter to Pike and her discharge, Charlene Baxter went to considerable lengths to provide Scott with guidance aimed at improving her job performance, and discharged her only after conducting a performance evaluation in accordance with established UNH personnel policies. See Kearney, 316 F.3d at 23 (causal connection not established when plaintiff was dismissed after defendant conducted an evidentiary hearing that assured that plaintiff received procedural fairness). Third, and perhaps most importantly, the undisputed factual record

26

demonstrates that even after the December 2001 performance evaluation, Scott was offered continued employment, albeit under probationary status. Scott was discharged because she declined defendant's offer of continued employment. Her decision to decline defendant's offer was an intervening act that would prevent any reasonable jury from finding that retaliation for Scott's letter of complaint to Pike was the cause for her dismissal.

Scott has not produced evidence from which a reasonable jury could find a causal connection between her protected conduct and her discharge. Thus, she has not established a prima facie claim of retaliatory discharge. Moreover, even if she had established a prima facie claim, she cannot establish that defendant's reasons for discharging her were pretextual because she has produced no evidence from which a jury could find that any of defendant's employees harbored racial animus toward her.

IV. <u>RSA 354-A</u>

Scott has also made a claim under RSA 354-A. Defendant is entitled to judgment as a matter of law on Scott's state claims for the same reasons that support judgment in defendant's favor on her Title VII claim.

**Conclusion**

There is no doubt that Mariatou (Diallo) Scott's tenure at UNH was unhappy and contentious. However, based upon the evidence properly before the court, no reasonable fact finder could conclude by a preponderance of the evidence that her race or national origin played any meaningful part in the incidents and episodes she characterizes as racially discriminatory. Scott is of African descent, and her white supervisors made decisions and enforced policies with which she did not agree. But those two facts, standing alone, are insufficient to state a claim of racial discrimination. Scott was not entitled, any more than any other employee, to dictate the terms of her employment by choosing which rules to follow and which rules to ignore, nor was she entitled to violate agency policies without consequences. In sum, Scott's disappointment that her

employment did not work out is completely understandable, and although she appears sincere in her belief that she was discriminated against, that belief alone does not amount to a viable claim under Title VII. Based upon the evidence produced at the summary judgment stage, no reasonable jury could conclude that Scott was discriminated against because of her race or national origin.

For the reasons given above, defendant's motion for summary judgment (document no. 19) is granted. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 9, 2004

cc:  Mariatou Scott
     Debra W. Ford, Esq.