**GENERAL HEALTHCARE
LIMITED, Plaintiff,**

v.

**Isam QASHAT, Kent International
Products, Inc., Defendants.**

No. CIV.A.2000–10191–RBC.

United States District Court,
D. Massachusetts.

March 31, 2003.

Ronald E. Wiss, Wolff & Samson, P.A., Adam K. Berman, Wolf & Sampson, P.A., Roseland, NJ, James J. Marcellino, Nathaniel J. Dudley, McDermott, Will & Emery, Boston, MA, for General Healthcare Limited Plaintiff.

Edward F. Perlman, Michael A. Albert, Wolf, Greenfield & Sacks, PC, Boston, MA, Robert E. Rigby, Jr., Cesari & McKenna, LLP, for Isam Qashat, Kent International Products, Inc., Defendants.

### MEMORANDUM AND ORDER ON PLAINTIFF GENERAL HEALTH-CARE LIMITED'S MOTION FOR SUMMARY JUDGMENT (# 45) AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (# 52)

COLLINGS, United States Magistrate Judge.

### I. Introduction

On February 1, 2000, plaintiff General Healthcare Limited (hereinafter "GHL") filed a three count complaint (# 1) against defendants Isam Qashat (hereinafter "Qashat") and Kent International Products, Inc. (hereinafter "KIP") alleging two claims of unfair competition and false advertising under the Lanham Act and seeking cancellation of certain trademark registrations all in relation to the defendants' use of the KENT trademark and the plaintiff's alleged proprietary trade dress. Approximately a month and a half later the defendants filed an answer to the complaint along with counterclaims for trademark infringement against GHL. (# 4) GHL duly filed its answer to the counterclaims (# 8) on April 12, 2000.

Thereafter discovery was undertaken, albeit with a few skirmishes. On March 15, 2002, with the parties' consent, this case was referred and reassigned to the undersigned for all purposes including trial and the entry of judgment pursuant to 28 U.S.C. § 636(c). Discovery was then completed in June, 2002, and a schedule for the filing of cross-motions for summary judgment issued. (# 43)

On June 25, 2002, the parties submitted a joint statement of stipulated facts. (# 51) About a week later on July 1, 2002, the following papers were filed: GHL's motion for summary judgment (# 45) as well as its memorandum in support (# 46), its statement of facts (# 47) and three declarations. (48, 49, 50) On even date the defendants too filed their summary judgment motion (# 52) together with a memorandum in support (# 53), a statement of facts (# 54) and an affidavit with exhibits. (# 55) The plaintiff filed its opposition to the defendants' dispositive motion (# 56) and its reply/response to the Rule 56.1 statement (# 57) on July 15, 2002. Similarly, the defendants timely filed their opposition to GHL's summary judgment motion (# 58), their Local Rule

56.1 statement of facts (# 59) and another declaration. (# 60) Both sides submitted their reply memoranda in support of their respective motions on July 26, 2002[1]. (61, 62)

A hearing on the summary judgment motions was held on March 24, 2003. With the record now complete, the parties' cross-motions for summary judgment are in a posture for resolution.

## II. The Facts

As noted, the parties have filed a fairly extensive joint statement of stipulated facts (# 51) that shall be repeated herein essentially verbatim, absent quotations.

In or about 1982, Healthcare International ("HCI") began manufacturing and selling a product used for hair lightening under the trademarks KENT and KENT CREME BLEACH. HCI was a corporation of the state of Connecticut, which has been dissolved. HCI's principal was Salvatore Rodino.

On May 5, 1986, HCI filed an application with the United States Patent and Trademark Office ("USPTO") to register the mark KENT CREME BLEACH. On September 29, 1986, the USPTO issued to HCI a final refusal to register the said mark. HCI did not respond to that office action, and accordingly HCI was deemed to have abandoned its application to register the mark effective March 30, 1987, as reflected in the USPTO's records.

Salvatore Rodino died in February 1988.

GHL is a British Company with its principal place of business in the United Kingdom. GHL's principal is Adel Kseib.

In February 1989, Adel Kseib met with Mr. Rodino's widow, Lena Rodino, in New York City. Other people, including Mr. Rodino's son Mark Rodino, and a person by the name of Nisso Benatar, may have been present at that meeting as well. At the meeting, Mr. Kseib made a payment to Lena Rodino. Subsequently, Mrs. Rodino signed letters to at least one of HCI's manufacturers and suppliers asserting that the KENT trademark had been sold to Mr. Kseib of GHL.

Since its alleged acquisition of the marks in 1989, GHL had not sold any products under the marks KENT or KENT CREME BLEACH in the United States, nor has GHL applied to register either of the KENT marks in the United States.

After the February 1989 meeting, GHL began gearing up to sell products under the KENT name in the Middle East. To do so they contacted and ultimately used at least one of HCI's former manufacturers or suppliers. In 1990, GHL began manufacturing its KENT CREME BLEACH product, using the identical trademarks and trade dress that had previously been used by HCI.

Since 1990, GHL has used a manufacturer, Corwood Laboratories, in the United States to make the creme for its product bearing the KENT marks. Since 1990, the tubes for the creme, which are affixed with the KENT trademark, have also been made by a company in the United States. From 1990 to 1995 or 1996 assembly of GHL's product took place in the United States, with the final products being shipped, by a company named Colora, to GHL in the United Kingdom. GHL then sold the product from its offices in the United Kingdom to customers in the Middle East. Since around 1995 or 1996, the boxes and inserts for GHL's product bearing the KENT marks have been made in the United Kingdom, and final assembly of GHL's products has been done by GHL in

---

**1.** The defendants have also filed a motion to strike a portion of the plaintiff's reply brief (# 63) which motion GHL opposes (# 64).

the United Kingdom. At all times, GHL's fully assembled KENT product has been sold by GHL only from the United Kingdom only to buyers in the Middle East.

In 1989, Qashat contacted counsel and indicated he was interested in using the trademarks KENT and KENT CREME BLEACH in the United States and inquired as to their legal availability. Qashat's counsel determined that the marks were available to use and register and advised Qashat as such.

On July 9, 1990, Qashat filed an application to register the mark KENT CREME BLEACH with the USPTO. At least as early as that month (July 1990), Qashat began selling creme bleach products under the KENT marks.

The trademarks and trade dress used by KIP for its KENT CREME BLEACH were copied from, and are virtually identical to, those previously used by HCI. The specimens of use submitted by Qashat to the USPTO consisted of packaging that was likewise virtually identical in appearance to that which had previously been used by HCI. During the application process for KENT CREME BLEACH, Qashat listed himself as the applicant with the d/b/a "Hair Care International."

GHL did not file any opposition to Qashat's 1990 trademark application when the mark was published for opposition. The trademark registration for KENT CREME BLEACH issued to Qashat on June 23, 1992 by the USPTO, under U.S. Trademark Registration No. 1,692,744. Qashat subsequently assigned that registration to KIP. After the mark had been registered for over five years, KIP filed its affidavit of incontestability pursuant to Section 15 of the Trademark Act, which was accepted and acknowledged by the USPTO on August 12, 1998. GHL never filed a petition to cancel this registration with the PTO.

On November 7, 1994, KIP filed an application with the USPTO to register the mark KENT (in stylized form). GHL did not file any opposition to this application when it was published for opposition. In 1998, the USPTO issued U.S. Registration No. 2,193,960 to KIP. GHL never filed a petition to cancel this registration with the PTO.

Since 1990, KIP or its predecessors have made personal grooming products in the United States under and in connection with the KENT marks. The sales of such products have primarily been from the United States to customers abroad. At least some sales have been to customers in the United States. The volume of sales KIP makes from the U.S. to customers overseas (primarily in the Middle East) far exceeds the volume of its sales in the U.S.

Since 1990, Qashat and KIP have built their business around the sale of KENT CREME BLEACH. More than ninety percent of KIP's business is related to KENT CREME BLEACH.

Both GHL and KIP have expended resources in advertising and promoting their respective products bearing the KENT Trademarks.

On December 17, 1990, Qashat caused a cease-and-desist letter to be sent to one of GHL's distributors, Khlaywi Establishment, in Riyadh, Saudi Arabia, complaining about its sale of GHL's KENT CREME BLEACH product.

On March 21, 1991, GHL, through counsel, sent Qashat a cease-and-desist letter asserting, inter alia, that GHL owned the mark KENT CREME BLEACH, complaining about Qashat's sales of a product under that name.

The KENT Trademarks as used by the two parties, and the products in connection with which these marks are used, are virtually identical. These similarities extend

to the products' nature, purpose; contents, trademarks, trade dress, and channels of trade.

These stipulated facts suffice to set the controversy in context. Any necessary supplementation shall be made during the course of discussing the issues raised by the dispositive motions.

### III. The Summary Judgment Standard

Summary judgment is "a device that 'has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways.' " *Mullin v. Raytheon Co.*, 164 F.3d 696, 698 (1 Cir., 1999) (quoting *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1 Cir., 1991)). The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1 Cir., 1999). After the moving party has met its burden, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." *Id.*

When considering whether to grant summary judgment, the Court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court must "accept all reasonable inferences favorable to the nonmovant." *Mullin*, 164 F.3d at 698; *see also Feliciano v. State of Rhode Island*, 160 F.3d 780, 788 (1 Cir., 1998); *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1 Cir., 1998); *Dykes v. DePuy, Inc.*, 140 F.3d 31, 33 (1 Cir., 1998).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see also Fajardo Shopping Center, S.E., v. Sun Alliance Insurance Company of Puerto Rico, Inc.*, 167 F.3d 1, 7 (1 Cir., 1999) ("[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party"); *De-Jesus-Adorno v. Browning Ferris of Puerto Rico*, 160 F.3d 839, 841–42 (1 Cir., 1998) ("A trialworthy issue exists ... [if] the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.' "); *Feliciano*, 160 F.3d at 784; *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 158 (1 Cir., 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; see also *De-Jesus-Adorno*, 160 F.3d at 841–42 ("A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law"); *Fajardo Shopping Center, S.E.*, 167 F.3d at 7 (citing *Pagano v. Frank*, 983 F.2d 343, 347 (1 Cir., 1993)). "Thus the substantive law defines which facts are material." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1 Cir., 1996) (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. See *Mullin*, 164 F.3d at 698 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1 Cir., 1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)) ("Its essential role is to 'pierce the boilerplate of the pleadings and assay the parties proof in order to determine whether trial is actually required.' "). Rather, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. Discussion

■ Although the defendants advance several bases for seeking brevis disposition of the plaintiff's unfair competition and false advertising claims (Counts I and II), only one argument needs to be discussed. Assuming without deciding that GHL did acquire rights to the KENT trademark from HCI or did in some manner establish priority to the KENT marks in the United States, in other words, that GHL had protectable rights in the KENT marks in this country, Qashat and KIP contend that the plaintiff has abandoned those rights. GHL adamantly disagrees, asserting that it has continuously used the KENT marks in commerce within the meaning of the

Lanham Act.[2] While the defendants bear the burden of proving abandonment by clear and convincing evidence,[3] "when a prima facie case of trademark abandonment exists because of nonuse of the mark for over two consecutive years,[4] the owner of the mark has the burden to demonstrate that circumstances do not justify the inference of intent not to resume." *Exxon Corporation v. Humble Exploration Company, Inc.*, 695 F.2d 96, 99 (5 Cir., 1983). See also McCarthy on Trademarks and Unfair Competition, Vol. 2 §§ 17:9—17:11.

Under the Lanham Act, "[t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." Title 15 U.S.C. § 1127. The statute further defines the term "use in commerce" to mean

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce . . .

Title 15 U.S.C. § 1127.

Lastly, in relevant part, the statute provides that:

---

**2.** The defendants' contentions first, that absent reliance on HCI's first use of the KENT marks, GHL cannot establish priority on its own, and second, that GHL has abandoned the KENT marks, essentially meld on the facts of this case. The principal inquiry on both issues is whether the plaintiff has used the KENT marks in commerce.

**3.** See McCarthy on Trademarks and Unfair Competition, Vol. 2 § 17:12 and cases cited therein.

**4.** It is now three consecutive years under the statute. See 15 U.S.C. § 1127.

A mark shall be deemed to be "abandoned" if either of the following occurs: (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark...

Title 15 U.S.C. § 1127.

With respect to this issue of "use in commerce", in their statement of undisputed facts the defendants assert as follows:

9. Notwithstanding its alleged acquisition of the KENT marks in 1989, GHL has not sold any products under the KENT marks in the United States, nor has GHL attempted to register the marks in the United States. GHL is located in the United Kingdom, has no offices or operations in the United States, and makes no sales in the United States. It sells (and always sold) its KENT product solely from its United Kingdom location to customers in the Middle East. To the extent products are shipped by GHL's manufacturers to the GHL (sic) for sale from United Kingdom (sic), these shipments are "in groupage" with other goods.

10. Since at least as far back as 1995, GHL's KENT CREME BLEACH product has been assembled in the United Kingdom.

11. The boxes and package inserts for GHL's products are made in the United Kingdom.

Defendant's (sic) Statement # 54 ¶¶ 9–11 (citations omitted).

■ The plaintiff counters these facts more with clarification than dissension:

9. Disputed in part. Plaintiff has at all times operated in the United States through its United States agent, Colora.

10. Disputed in part. Since 1995 or 1996, final assembly of the product has taken place in the United Kingdom. At all times, the end-user tubes with the KENT trademark and trade dress have been manufactured, printed, filled with the creme bleach and finished in the United States.

11. Disputed in part. The boxes and inserts have been made in the United Kingdom since 1995 or 1996.

Plaintiff General Healthcare Ltd.'s Response # 57 ¶¶ 9–11 (citations omitted). Based on these facts it is uncontested that GHL has never sold any products bearing the KENT trademark in or from the United States. However, the plaintiff claims to have been continuously using the KENT mark in commerce because its products bearing the KENT trademark have "always been transported from the United States to plaintiff's sales office in the United Kingdom, and later shipped for resale to the Middle East." (# 46 at 12) Under the case law, this is not enough.

In an appeal from the Patent and Trademark Office Trademark Trial and Appeal Board, the Federal Circuit addressed the question of whether the plaintiff's application to register a trademark was void ab initio because no use had been made of the mark prior to the filing of the application. *Avakoff v. Southern Pacific Company,* 765 F.2d 1097 (Fed.Cir., 1985). Although admittedly rendered in a slightly different context, the Court's discussion of the concept of "use in commerce" is incisive and on point:

The only shipment of the programs in interstate commerce prior to filing the application was the shipment to Avakoff, the alleged owner of the mark, by the manufacturer, who copied the original program and affixed labels bearing the marks thereto. The board held that such transportation of the goods, though

admittedly interstate, was purely a delivery of the goods to applicant from the manufacturer.... That is, it was a shipment of the goods in preparation for offering the goods for sale. It did not make the goods available to the purchasing public.

Without more, this type of shipment is clearly not activity amounting to a sale or transportation of the goods in commerce and does not constitute a bona fide shipment sufficient to lay a foundation for federal registration.

*Avakoff*, 765 F.2d at 1098.

The Court concluded that the Board did not err in finding that this type of shipment, even coupled with advertising of the product, did not "constitute[ ] use in commerce under § 1127." *Avakoff*, 765 F.2d at 1098. *See also Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11 Cir., 2001); *Blue Bell, Inc. v. Farah Manufacturing*, 508 F.2d 1260, 1265 (5 Cir., 1975)("Secret, undisclosed internal shipments are generally inadequate to support the denomination 'use.' Trademark claims based upon shipments from a producer's plant to its sales office, and vice versa, have often been disallowed."); *Harod v. Sage Products*, 188 F.Supp.2d 1369, 1376–7 (S.D.Ga., 2002) This, of course, is the only type of shipping or transport in which GHL has engaged: from the manufacturer in the United States to GHL, the purported holder of the mark, in the United Kingdom for sale by GHL from the United Kingdom to countries in the Middle East.[5]

The district court in New York has also had occasion to address this "use in commerce" issue at some length:

Similarly, not every transport of goods constitutes a bona fide use in commerce. "To warrant protection, use of a mark 'need not have gained wide public recognition,' but '[s]ecret, undisclosed internal shipments are generally inadequate.' " *Planetary Motion*, 261 F.3d at 1195 (citing *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)); *see also Paramount Pictures Corp. v. White*, 31 U.S.P.Q.2d 1768, 1772–73, 1994 WL 484936 (Trademark Tr. & App. Bd.1994) (affixing mark to a game consisting of three pieces of paper and distributing the game to promote a musical group was a de minimis use that was insufficient to support ownership rights).

The "talismanic test" for use in commerce remains "whether or not the use was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." See *Marvel Comics*, 837 F.Supp. at 548; *see also Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 113 (S.D.N.Y.1989) ("[T]rademark rights develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization.") rejected on other grounds by *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir.1995).

*Chere Amie, Inc. v. Windstar Apparel, Corp.*, 2002 WL 460065, at *4–*5 (S.D.N.Y.).

The requirement for public awareness of the mark is a consistent theme. "The use in commerce required for obtaining a federal registration is generally congruous with the required use of a mark for obtaining ownership under the common law.... Transportation in commerce generally constitutes a 'use' without a sale as long as the use is 'open and notorious' and before po-

---

5. Of course, sales from the United Kingdom to the Middle East would not support "use in commerce" in the United States. *See, e.g.,*

*Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568–69 (Fed.Cir., 1990).

tential customers." *Societe de Developments et D'Innovations des Marches Agricoles et Alimentaires–SODIMA–Union de Cooperatives Agricoles v. International Yogurt Co., Inc.,* 662 F.Supp. 839, 853 (D.Or., 1987). *See also Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.,* 146 F.3d 350, 357–60 (6 Cir., 1998); McCarthy on Trademarks and Unfair Competition, Vol. 3 § 19:118 (" 'Transportation' as an alternative to 'sale,' will usually require some element of open or public use. It seems clear that 'transportation,' as an alternative to 'sale,' requires the same elements of open and public use before potential customers. Thus, purely intra-company shipments...do not constitute bona fide shipments to satisfy the 'transportation' alternative.").

The plaintiff relies on the decision in *Purolator v. EFRA Distributors,* 687 F.2d 554 (1 Cir., 1982) for the proposition that a "mark [is] deemed to be used in commerce on goods when it is placed *in any manner* on the goods or their containers and goods are sold or transported in commerce." (# 46 at 13)(emphasis in original) The defendants contend, however, that in Purolator, the First Circuit merely decided the question of whether the district court had subject matter jurisdiction, not whether the defendant's use was sufficient to establish ownership of the trademark.

In Purolator, the defendant was a corporation in Puerto Rico which sold an automobile filter under the name "Puro Filter." The filter was manufactured in Illinois and then shipped to the defendant's distributorship in Puerto Rico, where the product was sold exclusively. The District Court found that the defendant's use of the filter and its similarity to the federally registered trademark owned by the plaintiff constituted trademark infringement under the Lanham Act.

On appeal, the defendant-appellant challenged the district court's jurisdiction, arguing that its own "use"—manufacture in Illinois and shipment to Puerto Rico where it was sold exclusively—was insufficient under the Lanham Act to constitute a "use in commerce." *Purolator,* 687 F.2d at 558. The First Circuit construed the issue raised by the defendant-appellant to be "the applicability of the federal trademark laws to this action." *Purolator,* 687 F.2d at 558. The Court held that the defendant's use of the trademark "establish[ed] a 'substantial impact' on interstate commerce well within the scope of the Lanham Act." *Purolator,* 687 F.2d at 559.

The holding in Purolator was that the manufacture and interstate shipment of goods from the manufacturer to the distributor with subsequent intrastate sales was sufficient to satisfy the threshold jurisdictional question under the Lanham Act. The case does not, as the plaintiff argues, stand for the proposition that mere interstate transportation of goods from a manufacturer to a sales or distribution office is sufficient to constitute actual ownership of the mark.

It is true that the First Circuit has recognized that interstate transportation without subsequent sales may, under certain circumstances, establish ownership over a particular trademark. Addressing the question as to whether a plaintiff had established his ownership to a mark by appropriation and use, the First Circuit explained that

No doubt sales of goods with the mark affixed thereon or thereto constitute a use or employment of the mark sufficient to establish ownership. And doubtless evidence of such sales will in the vast majority of cases constitute the basic, if not the sole, evidence relied upon to show a use adequate to establish appropriation and hence ownership. But to hold that a sale or sales are the sine qua non of a use sufficient to

amount to an appropriation would be to read an unwarranted limitation into the statute. . . . It seems to us that although evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case, and that evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales.

*New England Duplicating Co. v. Mendes,* 190 F.2d 415, 417–8 (1 Cir., 1951). *See also CCBN.com, Inc. v. c-call.com, Inc.,* 73 F.Supp.2d 106, 110 (D.Mass., 1999)("The First Circuit has set forth a two part test to determine whether a party has established 'prior use' of a mark in the absence of actual sales.")

Again, however, the internal shipments in this case from manufacturer to alleged trademark holder do not admit to any public awareness of the mark. Moreover, it is undisputed that the KENT product is transported "in groupage," meaning in a container with other products bearing no relationship with the trademark. Further, from 1995 or 1996, only part of the product is even transported from the manufacturer to GHL; for the past seven or eight years the KENT product is being packaged in the U.K.

Based on the facts of this case, GHL has never used the KENT trademark in commerce in the United States since the time it purportedly acquired rights to the mark in 1990. The defendants have established well more than three consecutive years of nonuse by the plaintiff of the trademark and so have proffered prima facie evidence of abandonment.

■ The second prong of the abandonment test under the statute is lack of

intent to resume use of the mark. It is important that the issue is lack of intent to resume use of the mark in the United States. *See Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.,* 892 F.2d 1021, 1024 (Fed.Cir., 1989); *Imperial Tobacco Limited, Assignee of Imperial Group PLC v. Philip Morris, Inc.,* 899 F.2d 1575, 1579 (Fed.Cir., 1990)(citing Cerveceria Centroamerica, S.A.) The fact that there exists an intent to continue foreign sales is immaterial.

■ As noted earlier, GHL "has the burden to demonstrate that circumstances do not justify the inference of intent to resume" use of the mark in the United States. The evidence of such intent in contained in the deposition of Adel Kseib, the general manager of GHL, who testified as follows:

Q. So you buy goods from the U.S.—

A. Importing goods. You don't sell to the United States. You buy from the United States.

Q. You don't sell any goods in the United States?

A. No.

Q. Have you ever—

A. Not for the time being. Not through General Healthcare. Never sold that.

\*    \*    \*    \*    \*    \*

Q. Have you ever sold any Kent Cream Bleach products in the U.S.?

A. No, not yet.

Q. Do you plan to begin selling in the U.S.?

A. Maybe in the future, yes.

Q. Have you taken any steps to introduce it to the U.S. market?

A. No. Since this litigation, I said I was not very keen to make any improvements of distribution, unless we sort out the problem.

Declaration of Adam K. Derman # 50, Exh. A at 10, 39.

This testimony, indefinite as to future intent, is insufficient as a matter of law to counter the presumption of abandonment arising from the nonuse of the mark. *Imperial Tobacco Limited,* 899 F.2d at 1580; *Silverman v. CBS, Inc.,* 870 F.2d 40, 45–6 (2 Cir., 1989) (intention to resume using the mark "at some point in the future" insufficient to rebut presumption; burden is to show "intent to resume use within the reasonably foreseeable future."); *Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.Supp.2d 247, 268–9 (S.D.N.Y., 2002)("Defendants must come forward with objective, hard evidence of actual 'concrete plans to resume use' in the 'reasonably foreseeable future...' and '[a] bare assertion of possible future use is not enough' to prove an intent to resume use." (quoting *Silverman,* 870 F.2d at 46–7)); see also McCarthy on Trademarks and Unfair Competition, Vol. 2 § 17:13 and cases cited therein. Given that what has been proferred on the issue is insufficient as a matter of law and no other evidence has been submitted on the issue by the plaintiff, I rule as a matter of law that the KENT trademark has been abandoned by GHL.

Turning now to the final claim in the complaint, the plaintiff contends that defendants' federal trademark registrations should be cancelled pursuant to the Lanham Act, 15 U.S.C. § 1119. GHL challenges both the incontestable registration, U.S. Trademark Registration No. 1, 692, 744, as well as KIP's second registration, U.S. Trademark Registration No. 2,193,-960.

■ The Lanham Act provides that, upon the meeting of certain requirements, a mark validly registered may be eligible for incontestable status after five consecutive years of continuous use in commerce. See Title 15 U.S.C. § 1065. Once incon-testability status is attained, the statute limits the circumstances under which such a registration may be cancelled. Two such grounds included in the statute are fraudulent acquisition of the registration and misrepresentation as to the "source of the goods or services on or in connection with which the mark is used." Title 15 U.S.C. § 1064(3). In addition, section 1065 provides that "the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration...." Title 15 U.S.C. § 1065. In other words, a user with a valid common law right to the mark as well as a priority use date over the registrant may properly challenge an otherwise incontestible registration. *See Wrist–Rocket Manufacturing Co., Inc. v. Saunders Archery Co.,* 578 F.2d 727, 731 (8 Cir., 1978). Although GHL relies on all three grounds in contesting the defendants' registrations, the plaintiff's substantive arguments need not be addressed.

As explained in a leading decision:

For a petitioner to prevail in a cancellation proceeding, it is incumbent upon that party to show (1) that it possesses standing to challenge the continued presence on the register of the subject registration and (2) that there is a valid ground why the registrant is not entitled under law to maintain the registration.

*Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 1026 (Fed.Cir., 1982)(footnote omitted). *See also Young v. AGB Corporation,* 152 F.3d 1377, 1379 (Fed.Cir., 1998).

■ In relevant part 15 U.S.C. § 1064 provides that "[a] petition to cancel a registration of a mark, stating the grounds relied upon, may,... be filed...by any person who believes that he is or will be damaged...by the registration of a mark

on the principal register..." As the Federal Circuit has observed, "[t]he purpose in requiring standing is to prevent litigation where there is no real controversy between the parties, where a plaintiff, petitioner or opposer, is no more than an intermeddler." *Lipton Industries,* 670 F.2d at 1028–9.

It is not the allegations of GHL's complaint that entitle it to seek cancellation of the defendants' trademarks.

> A petitioner's allegations alone do not establish standing. That is not to say that standing cannot be tested at the pleading stage. A party's pleading lays the foundation for standing. Thus, if it does not plead facts sufficient to show a personal interest in the outcome beyond that of the general public, the case may be dismissed for failure to state a claim. However, it does not follow that the facts affording a party standing, which as pleaded are sufficient as a matter of law, do not have to be proved by that party. As stated in *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1973): "(I)t is equally clear that the allegations must be true and capable of proof at trial."

*Lipton Industries,* 670 F.2d at 1028 (footnote omitted).

Having determined that GHL has no rights in the KENT trademark due to abandonment, at this juncture the plaintiff has no standing to seek cancellation of the defendants' registrations. GHL has no reasonable basis for believing that it is damaged by the registrations given that it has no interest in the marks. The reasoning of the district court for the Southern District of New York is fully applicable to the facts at hand:

> Under the Lanham Act, a party must have the requisite standing to petition for the cancellation of a registered

trademark. The petitioner must be one "who believes that he is or will be damaged by the registration of a mark on the principal registry." 15 U.S.C. § 1064. "[W]hen a [petitioner] has no right to use a name shown in a registered trademark of [another party], that [petitioner] has no standing to seek cancellation of the trademark." *In re Houbigant, Inc.,* 914 F.Supp. 997, 1002 (S.D.N.Y.1996) (citations omitted); *see Pan American World Airways, Inc. v. Eclipse Holdings, Inc.,* No. 95 Civ. 2763(LMM), 1998 WL 205313, at *4 (S.D.N.Y. April 27, 1998). "[A] petitioner for cancellation 'must show a real and rational basis for his belief that he would be damaged by the registration sought to be canceled, stemming from an actual commercial or pecuniary interest in his own mark.'" *Berliner v. Recordcraft Sales Corp.,* 1987 WL 5805, at *8 (S.D.N.Y. Jan.15, 1987) (quoting *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.,* 735 F.2d 346, 349 (9th Cir.1984)). In this case, Chaindom alleges no right to use the trademark at issue, THE CABLE COLLECTION, and no commercial or pecuniary interest in any trademark that is or will be damaged by continued registration of Plaintiff's trademark.

*Yurman Design Inc. v. Chaindom Enterprises, Inc.,* 2000 WL 897141, at *4 (S.D.N.Y.)(footnote omitted).

In short, GHL's claim for cancellation of the defendants' trademarks must fail.

### V. Conclusion And Order

For the reasons stated, it is ORDERED that Plaintiff General Healthcare Limited's Motion For Summary Judgment (# 45) be, and the same hereby is, DENIED. It is FURTHER ORDERED that Defendants' Motion For Summary Judgment (# 52) be, and the same hereby is, ALLOWED. At the conclusion of the case, judgment shall

enter for the defendants on all of plaintiff's claims.[6]

---

**6.**   Defendants' counterclaim remains outstand-   ing.   See # 4.