TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00131-CV






Texas Parks & Wildlife Department, Appellant


v.


Milburn Dearing; Kenneth Head; and Mike Warren, Individually, and on behalf of all
others similarly situated, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. GN102867, HONORABLE JOSEPH H. HART, JUDGE PRESIDING





O P I N I O N




 This is an interlocutory appeal from the denial of a plea to the jurisdiction and the
certification of a class action asserting disparate-impact liability for age discrimination under the
Texas Commission on Human Rights Act (the "Act"). See Tex. Lab. Code Ann. § 21.051 (West
1996). Appellees Milburn Dearing, Kenneth Head, Mike Warren, and others (collectively Dearing) (1)
brought a class-action lawsuit against their employer, the Texas Parks and Wildlife Department,
asserting breach of contract and age discrimination resulting from the Department's reclassification
of their game warden positions. The lawsuit sought a mandamus, damages, and declaratory and
equitable relief. The Department filed a plea to the jurisdiction, asserting sovereign immunity and
Dearing's untimeliness and failure to exhaust administrative remedies. The district court granted
the plea as to the contract, declaratory-judgment, and mandamus claims but denied it as to the age-discrimination claim. The district court also entered an order granting Dearing's motion for class
certification of the age-discrimination claim. The Department appeals the denial of its plea and the
class-certification order. We affirm the district court's denial of the Department's plea to the
jurisdiction on the issues of timeliness and exhaustion of administrative remedies. We reverse the
order certifying the class because we conclude that the only cause of action for which it was
certified--a disparate-impact theory of liability for age discrimination--is not available under the
Act.


BACKGROUND


 Milburn Dearing and his fellow employees are employed by the Department as game
wardens. Prior to 1994, there were four rungs on the Department's game-warden "career
ladder"--Game Warden I through Game Warden IV. Game wardens advanced from one rung to the
next every four years. The game warden advancements were based on years of service rather than
a competitive, promotional process. Only the legislature could create an additional rung on the
Department's ladder. In 1994, there were over a hundred game wardens at level IV, all with sixteen
or more years of service at the Department. In an effort to provide additional compensation to these
veteran game wardens, the Department reclassified 131 Game Wardens IV to the position "Field
Sergeant Game Warden." (2) The position of "sergeant" already existed at the Department; thus no
legislative action was required for the reclassification. The Department created some additional
duties for these newly classified sergeants, including the supervision of deer-decoy operations and
training of new officers. In 1995, the legislature passed a pay-parity rider, which required that "[t]he
Director of the Parks and Wildlife Department may not provide for the compensation of a state-commissioned peace officer at a rate less than the rate paid by any other state agency to a state-commissioned peace officer performing similar duties." See Act of May 25, 1995, 74th Leg., R.S.,
ch. 1063, 1995 Tex. Gen. Laws 5242, 5857 (effective Sept. 1, 1995). Several months after this bill
was passed, the Department had done nothing to determine whether the Field Sergeant Game
Wardens were being paid in parity with officers performing similar duties in other law enforcement
agencies. After pressure from members of the legislature, the Department's Executive Director,
Andrew Sansom, appointed a committee to study the pay-parity issue. The committee returned a
finding that the Field Sergeant Game Wardens were performing similar duties to sergeants in the
Department of Public Safety (DPS) and that the game wardens should therefore be compensated the
same as the DPS sergeants. The Field Sergeant Game Wardens were then given a raise in early
1996.

 In 1997, the legislature added a fifth rung to the game warden ladder--Game Warden
V--and adopted Salary Schedule C, which designated that the Game Warden V position be
compensated at the C-6 pay level. See Act of May 29, 1997, 75th Leg., R.S., ch. 1452, 1997 Tex.
Gen. Laws 5535, 6341 (effective Sept. 1, 1997). In the same bill, the legislature also provided that
the adoption of Salary Schedule C could not result in a pay reduction for any classified employee,
including game wardens. See id. at 6345 (the pay rider). As of the effective date of the 1997 bill,
the Department reclassified the Field Sergeant Game Wardens to the newly authorized position of
Game Warden V, because their duties matched the legislative description of Game Warden V. 
Moreover, as the only non-competitively acquired sergeant position in the Department, Field
Sergeant Game Warden was therefore not a "true" sergeant position, but more appropriately another
rung on the career ladder. However, because of the pay rider forbidding the reduction of any
employee's pay, the so-called "grandfathered" Game Wardens V continued to be paid at their
previous salary (equivalent to the then C-7 salary).

 The appropriations act of 1999 created salary increases for all peace-officer positions
in Texas. See Act of Apr. 23, 1999, 76th Leg., R.S., ch. 1589, 1999 Tex. Gen. Laws 5446, 6262-6263 (effective Sept. 1, 1999). On September 1, 1999, the Department ceased classifying the
grandfathered Game Wardens V at the C-7 level and reclassified all employees in that group at the
C-6 level. As a result, the reclassified Sergeant Game Wardens, formerly paid at the C-7 level of
$42,084, received a salary increase to $44,600 (the new C-6 pay) instead of $51,600 (the new C-7
pay). It is this reclassification, from the C-7 to the C-6 level, that Dearing asserts was unlawful age
discrimination.

 Milburn Dearing filed a complaint with the Texas Commission on Human Rights on
February 22, 2000, alleging that reclassification of the grandfathered Game Wardens V from the C-7
to the C-6 pay level constituted age discrimination because it had a disproportionate impact on
employees over the age of forty, (3) because none of the other sergeant positions at the Department
were reclassified. The complaint asserted a class-action claim. The Commission accepted Milburn
Dearing's complaint as timely; noted that the date of the discriminatory act was September 1, 1999;
acknowledged that the complaint was a class-action claim; and issued Milburn Dearing a right-to-sue
letter.

 Dearing filed a class-action lawsuit in Travis County district court, alleging age
discrimination and breach of contract, seeking a declaratory judgment that the Department violated
the 1997 and 1999 appropriations acts, and seeking a mandamus to remedy the Department's abuse
in downgrading the grandfathered game wardens to pay level C-6. Dearing also filed a motion to
certify the class, defined as "all Field Sergeant Game Wardens employed by the Texas Parks and
Wildlife Department on September 1, 1999 who were reclassified from pay group C-7 to pay group
C-6 and from Field Sergeant Game Warden to Game Warden V." 

 The Department filed a plea to the jurisdiction, asserting that (1) the age-discrimination claim was barred because the complaint filed with the Commission was untimely,
plaintiffs failed to exhaust administrative remedies, and the reclassification was legislatively
mandated; (2) the breach-of-contract claim was barred due to sovereign immunity; (3) the mandamus
claim could not stand because a mandamus is an extraordinary remedy to be used only when there
is no other adequate remedy at law, and plaintiffs had asserted various other causes of action
sufficiently adequate; and (4) the declaratory-judgment claim could not stand alone as a cause of
action because the Texas Uniform Declaratory Judgments Act is merely a procedural device for
deciding cases already within the court's jurisdiction. The Department also filed a motion for
summary judgment on four grounds: (1) Milburn Dearing did not file a timely complaint with the
Commission; (2) Milburn Dearing did not file the lawsuit within the statute of limitations; (3)
Milburn Dearing did not exhaust administrative remedies; and (4) the reclassification at issue was
the result of a legislative mandate.

 After a hearing, the district court granted the Department's plea to the jurisdiction on
the breach-of-contract, declaratory-judgment, and mandamus claims but denied it as to the age-discrimination claims. It denied the Department's summary-judgment motion. (4) The court also
granted Dearing's motion for class certification. The certification order decreed the trial plan for the
case: "the issues remaining to be tried in this case are: (a) Plaintiffs' disparate impact claims for age
discrimination in violation of Tex. Labor Code Ann. § 21.051 [and defendants' affirmative
defenses]." The Department brought this interlocutory appeal, (5) challenging the court's order
certifying the class and denial of its plea to the jurisdiction.


DISCUSSION


I. Plea to the jurisdiction

 Standard of review

 A plea to the jurisdiction challenges the trial court's authority to determine the subject
matter of a specific cause of action. Rylander v. Caldwell, 23 S.W.3d 132, 135 (Tex. App.--Austin
2000, no pet.). In order to prevail, the party asserting the plea to the jurisdiction must show that even
if all the allegations in the plaintiff's pleadings are taken as true, there is an incurable jurisdictional
defect apparent from the face of the pleadings, rendering it impossible for the plaintiff's petition to
confer jurisdiction on the trial court. See id. Because subject-matter jurisdiction presents a question
of law, we review the district court's decision de novo. Id. In reviewing a trial court's ruling on a
plea to the jurisdiction, we do not look at the merits of the case; rather, we "construe the pleadings
in favor of the plaintiff," look to the pleader's intent, and accept the pleadings' factual allegations
as true. Id. "The truth of the plaintiff's allegations is at issue only if the defendant pleads and proves
that the allegations were fraudulently made to confer jurisdiction on the court." Id. Further, "a court
deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider
evidence and must do so when necessary to resolve the jurisdictional issues raised." Bland Indep.
Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000).


 Timeliness of complaint

 The Department argues that its plea to the jurisdiction should have been granted
because Dearing did not timely file his administrative complaint with the Texas Commission on
Human Rights, a prerequisite to suit. See Specialty Retailers, Inc. v. DeMoranville, 933 S.W.2d 490,
491-92 (Tex. 1996). A complaint with the Commission must be filed no later than 180 days after
the alleged unlawful employment practice occurred. Tex. Lab. Code Ann. § 21.202 (West 1996). 
A complaint filed with the Commission is mandatory and jurisdictional. Schroeder v. Texas Iron
Works, Inc., 813 S.W.2d 483, 485-86 (Tex. 1991). In other words, a person claiming that an
employer has violated the Act must file a complaint with the Commission and otherwise exhaust
administrative remedies before filing a civil action alleging violations of the Act. Id. at 488. The
complaint filed with the Commission must be filed within 180 days after the "alleged unlawful
employment practice occurred," or the complainant's claim is time-barred. DeMoranville, 933
S.W.2d at 491-92.

 Here, the alleged unlawful practice was the reclassification of the game wardens from
C-6 to C-7, which occurred on September 1, 1999--the date on which the 1999 appropriations act
took effect. Until that date, the Department did not have the authority to downgrade the
grandfathered game wardens because such action would have resulted in a decrease in their pay,
which was specifically prohibited in the 1997 appropriations act. See Act of May 29, 1997, 75th
Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 634. Even though the Department may have made
the decision to reclassify the wardens in early August 1999, as evidenced by an inter-office
memorandum, it could not legally do so until the 1999 act became effective. Milburn Dearing's
complaint was filed on February 22, 2000--within 180 days after the 1999 act's effective date of
September 1.

 Nonetheless, the Department argues that Dearing's complaint was untimely because
the limitations period begins to run when the employee is informed of the allegedly discriminatory
employment decision, not when that decision comes to fruition or when the consequences of the act
became most painful. See id. at 492-93. The Department asserts that Dearing knew of the
reclassification by at least August 10, 1999, when he attended a mandatory meeting of game wardens
held in New Braunfels. At this meeting, according to evidence submitted by the Department, the
topic of reclassification "was discussed," and it was "made known to those in attendance" that the
reclassification would become effective September 1, 1999. Alternatively, the Department asserts
that Dearing knew of the reclassification as early as either the 1997 legislation or the 1999
legislation. Each of the three dates the Department asserts began the running of the limitations
period would push Dearing's complaint out of the 180-day filing window and make it untimely. We
disagree with the Department's assertion.

 The statute clearly hinges the running of the limitations period on the date of the
"unlawful employment action." See Tex. Lab. Code Ann. § 21.202. Although DeMoranville holds
that the limitations period begins to run on the date the employee is informed of the unlawful action,
that case concerned an employer's established company policy and unequivocal communication to
the employee that the policy would be enforced as to her, rather than an employer's decision to take
a future action based on new legislation giving it authority for the first time to do so. See
DeMoranville, 933 S.W.2d at 492-93 (holding that employee's notification that she would be
terminated if she did not return to work within one year of start of her medical leave began
limitations period running, rather than date on which she was actually terminated). We find this
distinction significant.

 Furthermore, whether Dearing knew definitively of the reclassification prior to
September 1 is a fact question. A trial court must accept the allegations in a plaintiff's pleadings as
true, unless the defendant pleads and proves that they were fraudulently made to confer jurisdiction. 
Bland, 34 S.W.3d at 554. The only evidence in the record going to what Dearing knew prior to
September 1 is slim and does not establish that Dearing knew of the reclassification at any time
before it actually occurred, on September 1. We also conclude that it is unlikely any reasonable
person in Dearing's position would have known prior to September 1 of the reclassification. See
Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 928 (Tex. 1996) (in wrongful
termination case, statute of limitations begins running when employee receives unequivocal notice
of termination or when reasonable person should have known of his termination). Lastly, the
Commission accepted Dearing's complaint as timely and identified the date of discrimination as
September 1, 1999. See Tex. Lab. Code Ann. § 21.202 (West 1996) (Commission must dismiss
untimely complaint); Gorges Foodservice Inc. v. Huerta, 964 S.W.2d 656, 664 (Tex. App.--Corpus
Christi 1997, no writ) (jury could rationally infer from Commission's issuance of right-to-sue letter
that complaint was timely filed). We therefore hold that Dearing's complaint was timely filed with
the Commission and overrule the Department's first issue.


 Single-filing rule

 The Department next asserts that the district court erred in not granting its plea to the
jurisdiction because none of the plaintiffs exhausted their administrative remedies prior to filing suit,
depriving the district court of subject-matter jurisdiction. The Department argues that even if
Milburn Dearing's complaint with the Commission was timely filed, none of the other plaintiffs filed
a complaint, and his complaint may not substitute for individual filings by each potential class
member. Because we have concluded that Milburn Dearing's complaint was timely filed, we
proceed to a discussion of whether the other plaintiffs may "piggyback" on his complaint, under the
so-called "single-filing rule." See Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1223 (5th Cir. 1995);
Anson v. University of Tex. Health Sci. Ctr., 962 F.2d 539, 540-41 (5th Cir. 1992).

 Under federal law, the single-filing rule allows a plaintiff who has not filed a charge
with the Equal Employment Opportunity Commission (EEOC) to piggyback on the EEOC complaint
filed by another person who is similarly situated. Mooney, 54 F.3d at 1223. Two conditions must
be met for one or more plaintiffs to join individual claims if the named plaintiff filed a timely
administrative charge: the persons attempting to piggyback must be similarly situated to the person
who actually filed the EEOC charge, and the charge must provide notice of the collective or class-wide nature of the charge. Id. Although no Texas court has had occasion to consider applying the
single-filing rule to cases involving complaints filed with the Commission, "it is proper to look to
interpretation of parallel federal laws" when interpreting the Act. Stinnett v. Williamson County
Sheriff's Dep't, 858 S.W.2d 573, 576 (Tex. App.--Austin 1993, writ denied); see also Austin State
Hosp. v. Kitchen, 903 S.W.2d 83, 87-88 (Tex. App.--Austin 1995, no writ) ("Because the Act seeks
to promote federal civil rights policy and because Texas has little case law interpreting the Act, this
Court looks to analogous federal law when appropriate.").

 Section 21.201 of the Act provides support for the single-filing rule: "A person
claiming to be aggrieved by an unlawful employment practice or the person's agent may file a
complaint with the commission." Tex. Lab. Code Ann. § 21.201 (West 1996) (emphasis added). 
We hold that, under this statute, a person's "agent" could reasonably include a class representative. 
The statute at issue in the federal cases provides that "[n]o civil action may be commenced by an
individual under this section until 60 days after a charge alleging unlawful discrimination has been
filed with the [EEOC]. Such a charge shall be filed . . . within 300 days after the alleged unlawful
practice occurred." 29 U.S.C.A. § 626(d) (West 1999) (emphasis added); Anson, 96 F.2d at 541. 
The Texas statute, like the federal one, does not specifically include or exclude the single-filing rule. 
Because it is proper to look to interpretation of parallel federal laws, we adopt the single-filing rule
fashioned by federal courts.

 The policy behind the federal single-filing rule persuades us that it should apply to
state complaints filed with the Commission:


[I]t would be wasteful, if not vain, for numerous employees, all with the same
grievance, to have to process many identical complaints with the EEOC. As long as
the EEOC and the company are aware of the nature and scope of the allegations, the
purposes behind the filing requirement are satisfied and no injustice or contravention
of congressional intent occurs by allowing piggybacking.



Mooney, 54 F.3d at 1223 (internal quotations and citations omitted). We find that the same policy
applies to a class-action suit filed under the Act when the single, filed complaint adequately puts the
investigative agency and employer on notice of the extent of the allegations. It would be wasteful
of resources for each of numerous plaintiffs to file separate complaints when the grievances are the
same and one complaint could serve the same purpose. Here, there is no dispute that Milburn
Dearing's complaint stated its intent to make the age-discrimination claim against the Department
a class action. We hold that the single-filing rule applies to complaints filed with the Commission,
that all members of the purported class are similarly situated, and that Dearing's complaint
adequately stated its class-action intent. We overrule the Department's second issue.

 In a third issue, the Department asserts that its actions in reclassifying the Sergeant
Game Wardens were legislatively mandated and that the legislature's actions were rationally related
to a legitimate state interest, thus not subject to an attack based on age discrimination under Kimel
v. Florida Bd. of Regents. See 528 U.S. 62, 83-84, 91 (2000) (noting that rational-basis review
applies to age discrimination by states and holding that ADEA does not abrogate states' sovereign
immunity from suit by private individuals). However, the Department's reliance on Kimel is
misplaced because the Supreme Court explicitly noted that its holding did not foreclose plaintiffs'
ability to sue states under state age-discrimination statutes. Id. at 91-92. Furthermore, the
Department has not pointed us to any legislative or statutory references from which we can conclude
that its reclassification actions were required by law. We therefore overrule this issue.


II. Class Certification

 Standard of review

 A trial court's decision to certify a class must be reviewed for an abuse of discretion, 
but a reviewing court must not indulge every presumption in favor of the trial court's ruling. Henry
Schein, Inc. v. Stromboe, 102 S.W.3d 675, 691 (Tex. 2002). Although a trial court has discretion
to rule on class-certification issues, and some of its determinations must be given the benefit of the
doubt--like those based on its assessment of the credibility of witnesses, for example--the trial
court's exercise of discretion cannot be supported by every presumption that can be made in its
favor. It is actual, not presumed, conformance with Rule 42 that must govern. Id. at 691;
Southwestern Ref. Co., Inc. v. Bernal, 22 S.W.3d 425, 435 (Tex. 2000); see Tex. R. Civ. P. 42.


 Disparate impact

 The trial court certified this class to bring an age-discrimination claim based on a
disparate-impact theory of liability. The Department asserts that the class-certification order should
be vacated because disparate-impact claims--the only cause of action for which the class was
certified--are not viable under the Texas statute prohibiting age discrimination. In 1971, the United
States Supreme Court held that disparate-impact claims may be brought under Title VII. Griggs v.
Duke Power Co., 401 U.S. 424, 431 (1971). Disparate-impact claims arise from "employment
practices that are facially neutral in their treatment of different groups but that in fact fall more
harshly on one group than another and cannot be justified by business necessity." Hazen Paper Co.
v. Biggins, 507 U.S. 604, 609 (1993) (quoting International Bhd. of Teamsters v. United States, 431
U.S. 324, 335-36 n.15 (1977)). Under a disparate-impact theory, liability may result even without
an employer's discriminatory motive; disparate-treatment claims, by contrast, require proof that age
actually motivated the employer's decision. Id. at 609-10. Although Griggs made disparate-impact
claims available under Title VII, the federal courts have struggled with the applicability of disparate-impact claims under the ADEA. Because the state statute directs us to follow judicial interpretation
of the ADEA in determining the availability of a state disparate-impact theory, we must review this
debate between the federal courts of appeal. But first we begin our discussion with a close
examination of the Texas statute.

 Dearing seeks to sue under section 21.051 of the Act. That section prohibits unlawful
employment discrimination on the basis of race, color, disability, religion, sex, national origin, or
age. See Tex. Lab. Code Ann. § 21.051. Section 21.122 of the act, which specifically addresses
disparate-impact cases, reads:


(a) An unlawful employment practice based on disparate impact is established
under this chapter only if:


 (1) a complainant demonstrates that a respondent uses a particular employment
practice that causes a disparate impact on the basis of race, color, sex,
national origin, religion, or disability and the respondent fails to
demonstrate that the challenged practice is job-related for the position in
question and consistent with business necessity[.]


. . . . 


(b) To determine the availability of and burden of proof applicable to a disparate
impact case involving age discrimination, the court shall apply the judicial
interpretation of the Age Discrimination in Employment Act of 1967 [ADEA]
and its subsequent amendments (29 U.S.C. Section 621 et seq.).



Id. § 21.122 (West 1996) (emphasis added). Subsection (a), which establishes disparate-impact
claims, glaringly omits employment practices based on age discrimination. Subsection (b) addresses
age discrimination separately and hinges the availability of a disparate-impact cause of action on
judicial interpretation of the analogous federal act, the ADEA. The legislature specifically parsed
disparate-impact cases into two categories: those involving age discrimination, addressed in
subsection (b), and those involving any of the six other unlawful acts of discrimination, covered in
subsection (a). Thus, we must review "judicial interpretation" of the ADEA to determine whether
a disparate-impact claim involving age discrimination is available under the Act.

 The United States Supreme Court has not directly ruled on the availability of a
disparate-impact cause of action for age discrimination under the ADEA. In Hazen, the Court
focused on legislative intent to prevent age discrimination based on inaccurate and damaging
stereotypes and declined to address disparate-impact claims: "[W]e have never decided whether a
disparate impact theory of liability is available under the ADEA and we need not do so here." See
Hazen, 507 U.S. at 609 (citation omitted). Nevertheless, Hazen cast some doubt on the future of
disparate-impact claims. The Court noted that "disparate treatment . . . captures the essence of what
Congress sought to prohibit in the ADEA." Id. at 610. The court continued, "[W]hen the
employer's decision is wholly motivated by factors other than age, the problem of inaccurate and
stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age,
as pension status typically is." Id. at 611. Three concurring justices opined, "[T]here are substantial
arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." 
Id. at 618 (Kennedy, J., concurring). After Hazen, the United States Court of Appeals for the
Seventh Circuit, which had originally recognized disparate-impact suits, reversed its position. 
E.E.O.C. v. Francis W. Parker Sch., 41 F.3d 1073, 1076-77 (7th Cir. 1994). Both the Third and
Sixth Circuits have expressed considerable doubt as to whether a disparate-impact claim based on
age discrimination survives after Hazen, but in neither opinion was the issue squarely before the
court. See Lyon v. Ohio Educ. Ass'n, 53 F.3d 135, 139 n.5 (6th Cir. 1995); DiBiase v. SmithKline
Beecham Corp., 48 F.3d 719, 732 (3d Cir. 1995).

 Those federal courts of appeal that have found disparate-impact claims available
under the ADEA have based their determination on the similarity between the language in Title VII
and the ADEA. See Criley v. Delta Airlines, Inc., 119 F.3d 102, 105 (2d Cir. 1997); Lewis v.
Aerospace Cmty. Credit Union, 114 F.3d 745, 750 (8th Cir. 1997); E.E.O.C. v. Local 350, 998 F.2d
641, 648 n.1 (9th Cir. 1993). However, the majority of federal appellate courts have relied on
distinctions in both the language and the legislative intent behind Title VII and the ADEA to hold
that the disparate-impact theory crafted in Griggs is not actionable under the ADEA. Mullin v.
Raytheon Co., 164 F.3d 696, 700-01 (1st Cir. 1999), cert. denied, 528 U.S. 811 (1999); Ellis v.
United Airlines, Inc., 73 F.3d 999, 1006-07 (10th Cir. 1996); Adams v. Florida Power Corp., 255
F.3d 1322, 1325-26 (11th Cir. 2001). 

 The United States Court of Appeals for the Fifth Circuit has recently joined this
majority in concluding that a disparate-impact theory of liability is not actionable under the ADEA
in this circuit. See Smith v. City of Jackson, Miss., ___ F.3d ___, No. 02-60850, 2003 U.S. App.
LEXIS 23125, at *34, (5th Cir. Nov. 13, 2003). We proceed to a consideration of the reasoning
behind the holding in Smith and the opinions that it follows.

 Smith begins by noting the similarity between the ADEA and Title VII, the statute that
gave rise to the disparate-impact theory of liability based on race-disparate impact, regardless of
motive. Id. at *11. The language of the ADEA closely parallels that of Title VII, indeed "the
prohibitions of the ADEA were derived in haec verba from Title VII." Lorillard v. Pons, 434 U.S.
575, 584 (1978). It is this similarity that persuaded the Second, Eighth and Ninth Circuits to
recognize disparate-impact claims under the ADEA. See Geller v. Markham, 635 F.2d 1027, 1031-32 (2d Cir. 1980); Leftwich v. Harris-Stowe State Coll., 702 F.2d 686, 690 (8th Cir. 1983); Douglas
v. Anderson, 656 F.2d 528, 531 n.1 (9th Cir. 1981). However, Smith reaches a different conclusion
by noting that the text of the ADEA differs from Title VII in an important respect: Section 623(f)(1)
of the ADEA explicitly provides that an employer may "take any action otherwise prohibited . . .
where the differentiation is based on reasonable factors other than age." See 29 U.S.C.A. § 623(f)(1)
(West 1999); Smith, 2003 U.S. App. LEXIS 23125, at *16-17. Neither this exception nor any
parallel provision is found in Title VII. See Smith, 2003 U.S. App. LEXIS 23125, at *16-17. As the
Fifth Circuit recognized, this difference amounts to "a critical asymmetry" between the two statutes. 
Id.; see also Adams, 255 F.3d at 1325; Mullin, 164 F.3d at 701-02. When the "other reasonable
factors" exception in the ADEA is read together with its general prohibition against age
discrimination, the resulting construction follows: It is unlawful to "discriminate against any
individual . . . because of such individual's age," except when that employment action is "based on
. . . factors other than age." Smith, 2003 U.S. App. LEXIS 23125, at *18 (citing Mullin, 164 F.3d
at 702). The general prohibition and exception, read together, allow for discrimination against the
protected age group if the discrimination is based on some factor other than age. The Fifth Circuit
reasoned that, if the ADEA exception is not understood to preclude disparate-impact liability, "it
becomes nothing more than a bromide to the effect that 'only age discrimination is age
discrimination.'" Id. at *18-19 (quoting Mullin, 164 F.3d at 702). "Such a circular construction
would fly in the teeth of the well-settled canon that 'all words and provisions of statutes are intended
to have meaning and are to be given effect.'" Mullin, 164 F.3d at 702 (citation omitted).

 In support of this rationale, the Fifth Circuit notes the Supreme Court has held that
a similar exception in the Equal Pay Act precludes disparate-impact claims under that act. See
County of Washington v. Gunther, 452 U.S. 161, 169-71 (1981). Section 206(d)(1) of the Equal Pay
Act provides that wage discrimination on the basis of gender is prohibited, unless the wage
"differential is based on any other factor other than sex." See 29 U.S.C.A. § 206(d)(1) (West 1998). 
Each of the federal circuits that has disallowed disparate-impact claims under the ADEA has relied
on Gunther's interpretation of the similar "any other factor" exception in the Equal Pay Act to cast
doubt on the availability of disparate-impact claims under the ADEA. See Smith, 2003 U.S. App.
LEXIS 23125, at *23-24; Adams, 255 F.3d at 1325; Ellis, 73 F.3d at 1008; Mullin, 164 F.3d at 702;
Francis W. Parker Sch., 41 F.3d at 1077. Although the ADEA exception references "reasonable
factors other than age," while the Equal Pay Act omits the word reasonable, both the Fifth and
Eleventh Circuits have found that the ADEA exception makes it more like the Equal Pay Act than
Title VII, which has no such exception. See Smith, 2003 U.S. App. LEXIS 23125, at *27-28; Adams,
255 F.3d at 1325 n.6.

 Secondly, Smith notes that the legislative history of the ADEA is different from that
of Title VII. The ADEA was enacted after the Secretary of Labor issued a report on age
discrimination recommending that Congress ban arbitrary discrimination, such as disparate treatment
based on stereotypical perceptions of the elderly, but that factors affecting older workers, such as
policies with disparate impact, be addressed in alternative ways. Smith, 2003 U.S. App. LEXIS
23125, at *31; Mullin, 164 F.3d at 702-03; see U.S. Dep't of Labor, The Older American Worker:
Age Discrimination in Employment 2, 6, 21-25 (1965) (Congress should prohibit "arbitrary
discrimination" based on age and age stereotypes, but factors that "affect older workers more
strongly, as a group, than they do younger workers" should be addressed through programmatic
measures to improve opportunities for older workers.). Title VII, on the other hand, had a broad
remedial purpose: To "achieve equality of employment opportunities and remove barriers that have
operated in the past to favor an identifiable group of white employees over other employees." 
Griggs, 401 U.S. at 429-30, quoted in Smith, 2003 U.S. App. LEXIS 23125, at *31-32; Adams, 255
F.3d at 1325-26 ("history of the ADEA differs from the legislative history of Title VII, which the
Supreme Court in Griggs relied on to find a cause of action for disparate impact"); Ellis, 73 F.3d at
1008 ("legislative history of the ADEA suggests it was not enacted to address disparate impact
claims"). "The cornerstone of Griggs's holding that disparate impact is cognizable under Title VII
is thus the link between the history of educational discrimination on the basis of race and the use of
that discrimination to continue to disadvantage individuals on the basis of their race." Smith, 2003
U.S. App. LEXIS 23125, at *33 (citing Griggs, 401 U.S. at 432). "[A]bsent from the scope of the
ADEA are the historical and remedial concerns that, in the Title VII context, led to the recognition
of disparate impact claims directed at overcoming the consequences of past societal discrimination." 
Id.

 This distinctive legislative intent to allow disparate-impact claims for Title VII
discrimination but not necessarily for age discrimination is further revealed by comparing subsequent
amendments to Title VII and the ADEA. Congress explicitly added a disparate-impact cause of
action to Title VII in the 1991 Civil Rights Act. See Civil Rights Act of 1991, Pub. L. No. 102-166,
105 Stat. 1071, 1074-75 (1991) (codified at 42 U.S.C.A. § 2000e-2(k) (West 2003)) (hereinafter
cited as Civil Rights Act of 1991); see Ellis, 73 F.3d at 1008; Mullin, 164 F.3d at 703. Although we
can understand little of legislative intent from a body's failure to act, Congress added no such
parallel provision to the ADEA, despite its amendment of other portions of the ADEA. See, e.g.,
Civil Rights Act of 1991 at 115, 105 Stat. at 1079 (amending time period within which an employee
may file civil actions); Civil Rights Act of 1991 at 302(2), 105 Stat. at 1088 (extending coverage of
ADEA to congressional employees). While courts should ordinarily "tread slowly in premising
statutory construction on the action (or inaction) of subsequent Congresses . . . [,]what transpires in
a later legislative session sometimes constitutes a useful source of guidance in statutory
interpretation cases." Mullin, 164 F.3d at 703 (citations omitted). Therefore, "Congress'[s] insertion
of an express provision for a disparate impact cause of action in Title VII renders the absence of such
a provision in the ADEA--which was undergoing revision at the same time by the same committees
and in the same bill--highly significant." (6) Id.

 Dearing insists that the reasoning of the Smith court is irrelevant because, unlike the
federal scheme, the Texas legislature chose to prohibit age discrimination in the same statute that
prohibits discrimination based on race, color, sex, national origin, religion, or disability, and thus
disparate-impact claims should apply equally to all claims of discrimination. Dearing would have
us ignore section 21.122, which states that disparate-impact claims are available for age
discrimination in this state only if they are available under the ADEA. See Tex. Lab. Code Ann.
§ 21.122. Furthermore, the language in the Act--added in 1995--mirrors the language added to
Title VII in 1991 codifying disparate-impact cases under Title VII, except that the Texas Act treats
disparate impact on the basis of age distinctly by removing it from the list of other forms of
discrimination that give rise to disparate-impact liability. Compare Tex. Lab. Code Ann. § 21.122,
with 42 U.S.C.A. § 2000e-2(k) (West 2003). We conclude, therefore, that the textual distinction
between the ADEA and Title VII noted in Smith is specifically mirrored in the Act. Smith has
declared that disparate-impact claims may not be redressed under the ADEA in this circuit. See
Smith, 2003 U.S. App. LEXIS 23125, at *34. We find the reasoning of the Fifth Circuit persuasive
and hold that there is no disparate-impact theory of liability under the Texas Act. (7)

 The trial plan contained in the district court's order certifying the class states that the
plaintiffs' disparate-impact claims for age discrimination and the defendants' affirmative defenses
to such claims are the only issues remaining to be tried in this class action. Because the only
certified class-action claim may not be redressed under the Act, the certification order is therefore
vacated, and the cause is remanded for further proceedings consistent with this opinion. See Warner-Lambert Co. v. Mills, 117 S.W.3d 488, 494 (Tex. App.--Beaumont 2003, no pet. h.) (holding that
causes of action for which class was certified were preempted by federal law and thus court lacked
subject-matter jurisdiction to certify class). (8)


CONCLUSION


 The district court's denial of the Department's plea to the jurisdiction was proper
because Milburn Dearing's complaint was timely filed with the Commission on Human Rights and,
under the single-filing rule, met the filing requirements for the other class members. However,
because the only cause of action for which the class was certified, a disparate-impact theory of
liability, is not available under the Texas Commission on Human Rights Act, we reverse the class
certification and remand the cause to the district court for further proceedings consistent with this
opinion.



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Patterson

Affirmed in Part; Reversed and Remanded in Part

Filed: January 8, 2004

1. We will refer to Milburn Dearing by his full name when referring to him in his individual
capacity.
2. There is evidence in the record to suggest that the Department's reclassification of the 131
employees fulfilled a return promise made by the Department or its former Executive Director,
Andrew Sansom, to the Texas Game Warden Association in exchange for the Association's help
with a legislative matter in 1993.
3. Section 21.101 of the Act provides that discrimination on the basis of age is prohibited
against individuals age forty or older. See Tex. Lab. Code Ann. § 21.101 (West 1996).
4. The Department's summary-judgment motion also asserted official immunity on the part
of Andrew Sansom, the Department's Executive Director at the time of the relevant actions
underlying the suit. The district court granted summary judgment in favor of the Department on this
ground only.
5. Although only final judgments are typically appealable, certain interlocutory orders are
appealable by statute, including orders certifying or refusing to certify a class and orders granting or
denying a governmental unit's plea to the jurisdiction. See Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(3), (8) (West Supp. 2004).
6. The Fifth Circuit did not accord much significance to the congressional inaction in adding
a disparate-impact claim to the ADEA but merely noted in passing the distinction with Title VII. 
Smith v. City of Jackson, Miss., ___ F.3d ___, No. 02-60850, 2003 U.S. App. LEXIS 23125, at *7
n.1, (5th Cir. Nov. 13, 2003).
7. Dearing argues that this Court is not bound by Fifth Circuit precedent on issues of federal
law. See Penrod Drilling Corp. v. Williams, 868 S.W.2d 294, 296 (Tex. 1993); Barstow v. State,
742 S.W.2d 495, 500-01 n.2 (Tex. App.--Austin 1987, writ denied). While we acknowledge the
holdings of Penrod and Barstow, we find that the overwhelming majority of "judicial interpretation"
of the ADEA is in accord with the decision reached in Smith.
8. Because we reverse the order certifying the class on jurisdictional grounds, we do not reach
the Department's final issue of whether the plaintiffs have met the numerosity, commonality,
predominance, and superiority requirements of Rule 42. See Tex. R. Civ. P. 42.